**CHICHESTER SCHOOL DISTRICT, Appellant,**

**v.**

**CHICHESTER EDUCATION ASSOCI-ATION and Chichester Administrators' Association.**

Commonwealth Court of Pennsylvania.

Argued March 8, 2000.

Decided April 14, 2000.

Terry Elizabeth Silva, Marcus Hook, for appellant.

Donna S. Weldon, Harrisburg, for appellee, Chichester Administrators' Assoc.

Lynne L. Wilson, Harrisburg for appellee, Chichester Education Association.

Before FRIEDMAN, J., KELLEY, J., and McCLOSKEY, Senior Judge.

McCLOSKEY, Senior Judge.

Chichester School District (the District) appeals from an order of the Court of Common Pleas of Delaware County (trial court), granting the preliminary objections filed on behalf of the Chichester Education Association (CEA) and the Chichester Administrators' Association (CAA) and dismissing the District's petition to set aside contracts. We affirm.

The District is a school district of the third class operating within the Commonwealth. The District was formed in the 1960's and included four municipalities, i.e., Upper Chichester Township, Lower Chichester Township, Marcus Hook Borough and Trainer Borough. Upper Chichester Township was the largest municipality within the District, comprised of five internal wards and over 50% of the population of the District.[1] Nevertheless, the District's Board of School Directors (Board) was apportioned according to sections of each of the municipalities, with Upper Chichester receiving four seats, Lower Chichester and Marcus Hook receiving two seats each and Trainer receiving one seat. Hence, the controlling votes for the District's decisions were in the hands of the three smaller municipalities.

In early 1996, certain Board members from Upper Chichester proposed motions to realign the District voluntarily, but said motions were defeated for minor procedural reasons or eventually lost by a vote of the majority Board members residing outside of Upper Chichester. In April of 1996, a group of taxpayers within the District filed a reapportionment action with the trial court. The trial court issued a decision in August of 1996 which approved a reapportionment plan offered by the Board. The trial court's order directed that adjustments in the regional boundaries of the existing nine-region plan be phased in by the November, 1999 elections, but that the then-existing Board would continue to function until that time.

Unhappy with a delayed reapportionment plan, the group of taxpayers filed an appeal with this Court. We noted our approval of the trial court's order insofar as it directed the reapportionment plan to be phased in by the November, 1999 elections and that the then-existing Board would continue to function.[2] However, we did vacate and remand for a finding as to whether the reapportionment plan created the most equal regions possible within the District. Additionally, in November of 1996, another group of taxpayers initiated litigation in federal court challenging the composition of the Board as violative of the "one person-one vote" mandate of Article I, Section 2 of the United States Constitution. In January of 1998, the federal court directed reapportionment.[3] After some

---

1. As of early 1996, Upper Chichester comprised approximately 64% of the population of the District.

2. In our opinion, we noted the lack of federal or state case law requiring immediate implementation of a reapportionment plan and instead recognized the discretion of the trial court to allow implementation in such a way so as to maintain a staggered election sched-

ule and minimize disruption to the District. See In re Petition to Reapportion the School Director Regions of the Chichester School District, 688 A.2d 1275 (Pa.Cmwlth.1997).

3. Part of the suit before the federal court was a pre-emptive citizens' challenge to the new collective bargaining agreements (discussed below) executed between the District and the CEA and the CAA. However, the federal court

refinement, the parties developed a tri-regional reapportionment plan. In accordance with this plan, a special election was held on May 19, 1998, and the terms of the then-Board members ceased as of June 30, 1998.

During the course of the state and federal litigation, the Board began negotiations with the CEA and the CAA with respect to new collective bargaining agreements as the prior agreements were nearing their expiration dates. The previous agreements had been for a period of three years, whereas the new agreements reached by the parties extended for a period of five years.[4] The new agreement with the CAA was ratified at a public Board meeting on June 25, 1996, and the new agreement with the CEA was ratified at a public Board meeting on September 17, 1996.[5] Thereafter, in January of 1999, the District filed the instant petition to set aside contracts arguing that the new agreements should be rescinded.[6]

Both the CEA and the CAA filed preliminary objections with the trial court as follows: (1) a preliminary objection with respect to lack of subject matter jurisdiction pursuant to Rule 1028(a)(1) of the Pennsylvania Rules of Civil Procedure; (2) a preliminary objection with respect to the District's alleged failure to comply with procedural rules pursuant to Pa. R.C.P. No. 1028(a)(2); and (3) a preliminary objection in the nature of a demurrer pursuant to Pa. R.C.P. No. 1028(a)(4). Essentially, the preliminary objections assert that the filing of a petition instead of a complaint rendered the suit procedurally and substantively defective under Pa. R.C.P. No. 1007, or, assuming that the suit was properly initiated, the pleadings set forth no legitimate cause of action. Ultimately, the trial court issued an order granting the preliminary objections of the CEA and the CAA and effectively dismissing the District's petition.[7] The District now appeals to this Court.

On appeal,[8] the District argues that the trial court erred as a matter of law in granting the preliminary objections and dismissing its petition, when said petition represented a procedurally proper pleading in equity. We disagree.

declined to hear this challenge and instead directed any contract disputes to the state courts. *See James v. Chichester School Board, 1998 WL 114525* (E.D. Pa., Civil Action Nos. 96–7683, 97–1663, filed January 30, 1998, 1998 U.S. Dist. LEXIS 1193).

4. The new agreement with the CEA is in effect from September 1, 1997, through August 31, 2002. The new agreement with the CAA is in effect from July 1, 1996, through June 30, 2002.

5. At this point in time, the trial court had already issued an order, which part we noted with approval, directing the development of a reapportionment plan to be phased in by the November, 1999 elections, but stating that the then-existing Board would continue to function. Moreover, federal litigation had not yet begun as of this time.

6. Specifically, the District contended that the Board that ratified the new agreements was a "lame duck" Board attempting to create long-term obligations for its successors in office thereby depriving said successors from negotiating and implementing their own policies

and contracts. Additionally, the District contended that its then-superintendent and one or two Board members negotiated in secret with the CEA and the CAA with respect to these new agreements.

7. Further, the trial court order indicated that the briefs of the CEA and the CAA would serve as its opinion in the matter.

8. Appellate review of an order granting preliminary objections in the nature of a demurrer is limited to determining whether the trial court abused its discretion or committed an error of law. *See Department of Transportation v. Wilkinsburg Penn Joint Water Authority*, 740 A.2d 322 (Pa.Cmwlth.1999). In conducting such review, we note that a demurrer admits every well-pleaded material fact set forth in the complaint as well as all inferences reasonably deducible therefrom. *Id.* The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. *See MacElree v. Philadelphia Newspapers, Inc.*, 544 Pa. 117, 674 A.2d 1050 (1996). Any doubt should be resolved in favor of overruling the demurrer. *Id.*

There is no dispute that an action to rescind a contract is an action for equitable relief. It is axiomatic that actions in equity are subject to the Pennsylvania Rules of Civil Procedure.[9] Pa. R.C.P. No. 1007 sets forth the two means by which civil actions, including actions in equity, can be initiated, i.e., by filing a praecipe for a writ of summons or a complaint. Our Supreme Court has previously held that the Rules of Civil Procedure do not provide for the commencement of an action in equity by a petition. *See Wm.Garlick & Sons, Inc. v. Lambert,* 446 Pa. 323, 287 A.2d 143 (1972); *Cooney v. Pennsylvania Osteopathic Association,* 434 Pa. 358, 253 A.2d 256 (1969). In *Garlick,* the Pennsylvania Supreme Court indicated that "[g]enerally, a petition is only permitted where it is ancillary to an already pending action." *Garlick,* 446 Pa. at 325, 287 A.2d at 144. Furthermore, in *Cooney,* the Supreme Court stated that "[a] complaint in equity [is] the correct course to pursue." *Cooney,* 434 Pa. at 359, 253 A.2d at 257.

■ In the instant case, the District simply filed a petition to set aside contracts with the trial court to initiate its equity action. The District did not file a praecipe for a writ of summons or a complaint. As the Rules of Civil Procedure and the cases interpreting the same have determined that a petition is not the procedurally proper way in which to initiate an action in equity, we cannot say that the trial court erred as a matter of law in granting the preliminary objections and dismissing the District's petition.[10]

■ Next, the District argues that the trial court erred as a matter of law in granting the preliminary objections and dismissing its petition, as said petition stated a cause of action under equitable principles for avoiding contracts. More specifically, the District argues that the new contracts executed between the Board and the CEA and the CAA were simply attempts to unduly bind successor Board members. Again, we disagree.

■ This Court has previously held that in the performance of governmental functions, discretionary public commitments cannot be made by officials in office where those commitments will unduly bind their successors in office or if such commitments are made "ultra vires." *See Lobolito, Inc. v. North Pocono School District,* 722 A.2d 249 (Pa.Cmwlth.1998), *petition for allowance of appeal granted,* 560 Pa. 676, 742 A.2d 173 (1999)[11]; *State Street Bank & Trust Co. v. Treasury Department,* 712 A.2d 811 (Pa.Cmwlth.1998) (last-minute contracts intended to bind a successor constitute a particularly egregious violation of public policy). An organization performs an "ultra vires" act if it performs the act without any authority to do so on a particular subject or if it has authority to do so but exercises it irregularly. Black's Law Dictionary 1522 (6th ed.1990). An outgoing board that attempts to create these types of long-term obligations and perform these "ultra vires" acts is commonly referred to as a "lame duck" board.

On the other hand, in the seminal case of *Horvat v. Jenkins Township School District,* 337 Pa. 193, 10 A.2d 390 (1940), our Supreme Court held that subsequent boards are bound by contracts validly

---

9. *See* Pa. R.C.P. No. 1501.

10. We note that at this point, having determined that the trial court properly granted the preliminary objections filed on behalf of the CEA and the CAA and dismissed the District's petition as a result of the District's failure to properly commence an action in equity, we are under no obligation to address the District's remaining argument on appeal. Nevertheless, we believe that the District's remaining argument raises important issues

with respect to "lame duck" boards and, hence, we will address the same.

11. In *Lobolito,* we noted a distinction between governmental functions, i.e., functions statutorily entrusted to legislative boards that are indispensable to the proper functioning of government, and proprietary functions, i.e., functions not statutorily required that may be carried on by private enterprise or undertaken as a means to raise revenue.

made by former board members and cannot "undo what the former Board had legally done." 337 Pa. at 195, 10 A.2d at 391.[12] Furthermore, in *Falls Township v. Scally*, 115 Pa.Cmwlth. 56, 539 A.2d 912 (1988), a case in which this Court actually concluded that a three-year employment contract between the Township's outgoing board and an environmental protection officer unduly burdened successor board members, we intimated an exception with respect to governmental functions. In *Scally* we stated that "[i]f Scally was performing a governmental function, then, absent a statute to the contrary, the outgoing Board of Supervisors had no authority to tie the hands of its successors." *Scally*, 539 A.2d at 914. Hence, we implied that governing bodies might bind successors to contracts involving governmental functions, provided there is statutory authority for doing so.

In the instant case, there is no question that the Board's actions, i.e., executing contracts with the CEA and the CAA, were governmental functions. In the course of its argument that the Board's performance of these functions was merely an attempt to unduly bind successor Board members, the District places heavy emphasis on the fact that the federal court and trial court would later determine that the then-existing Board members were sitting in violation of the "one person-one vote" mandate of the U.S. Constitution and that reapportionment was necessary. However, such emphasis is misplaced.

As the CEA and the CAA indicate, the notion of "lame duck" boards normally applies in instances of last-minute contracts or contracts executed near the end of the board members' terms. Here, the contracts executed between the Board and the CEA and the CAA were actually ratified by the Board at public hearings approximately two years prior to the election and seating of the successor Board members.[13] Sections 701 through 904 of the Public Employe Relations Act (PERA)[14] provide the Board members with the statutory authority to engage in negotiations and execute such contracts with employee organizations.[15]

Moreover, we have previously held that acts performed by a person acting under the color of official title are valid even though it is later discovered that the legality of that person's appointment or election to office was deficient. *See Finucane v. Pennsylvania Milk Marketing Board*, 135 Pa.Cmwlth. 606, 581 A.2d 1023 (1990).[16] Thus, we cannot say that the new contracts executed between the Board and the CEA and the CAA were simply attempts to unduly bind successor Board members. Nor can we say that the trial court erred as a matter of law in granting the prelimi-

---

**12.** This rationale was later followed in a non-employment context in *Detweiler v. School District of Borough of Hatfield* , 376 Pa. 555, 104 A.2d 110 (1954), a taxpayer's action in equity to stop establishment of a joint secondary school by several school districts. Our Supreme Court reaffirmed the aforementioned principle in *Horvat* that subsequent boards are bound by contracts validly made by former board members.

**13.** The contract with the CAA was ratified in June of 1996 and the contract with the CEA was ratified in September of 1996. As we noted above, at the time of this latter ratification, the trial court had issued an order, which part we noted with approval on appeal, allowing the then-existing Board to continue to function. Additionally, no federal litigation had begun as of this time.

**14.** Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.701–1101.904.

**15.** Further, we note that Section 1106 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 11–1106, provides that "[t]he board of school directors in every school district shall employ the necessary qualified professional employees, substitutes and temporary professional employees to keep the public schools open in their respective districts in compliance with the provisions of this act."

**16.** This doctrine is commonly referred to as the "de facto" officer doctrine.

nary objections in this regard and dismissing the District's petition.

Accordingly, the order of the trial court is affirmed.

## O R D E R

AND NOW, this 14th day of April, 2000, the order of the Court of Common Pleas of Delaware County is affirmed.