928 A.2d 1013

**PROGRAM ADMINISTRATION SERVICES, INC.,
f/k/a R.D. Fowler & Assoc., Inc., Appellee**

v.

**DAUPHIN COUNTY GENERAL AUTHORITY, Appellant.**

Supreme Court of Pennsylvania.

Re–Submitted May 18, 2006.

Decided Aug. 20, 2007.

Charles B. Zwally, Nauman, Smith, Shissler & Hall, LLP, Debra P. Fourlas and David E. Lehman, McNees, Wallace & Nurick, LLC, Harrisburg, for Dauphin County General Authority.

Thomas W. Scott, Killian & Gephart, LLP, Harrisburg, for Program Admin. Services, Inc.

CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN, and FITZGERALD, JJ.

## OPINION

Justice SAYLOR[1].

This appeal by allowance involves the issue of whether the board of directors of the Dauphin County General Authority may terminate, without cause, contracts executed by its prede-

1. This appeal was reassigned to this author.

cessor board relating to the administration of certain school-related financing activities.

Appellant, the Dauphin County General Authority (the "Authority"), is a corporate agency of the Commonwealth created by Dauphin County pursuant to the Municipality Authorities Act.[2] The act authorizes the creation of municipality authorities for a wide range of purposes, one of which is to secure long term financing for public projects or uses, including public schools, by issuing revenue bonds for a term not exceeding forty years. Included among its powers under the act, the Authority may "make agreements with the purchasers or holders of the bonds or with others in connection with any bonds, whether issued or to be issued, as the authority shall deem advisable." 53 Pa.C.S. § 5607(d)(12).

Pursuant to these powers, in 1986 the Authority launched a program to provide financial assistance to Pennsylvania school districts seeking to borrow money to finance new capital improvements or refinance existing debt. This program, known as "School Pool I," was funded by $200 million in proceeds from the public sale of 40–year tax-exempt bonds set to mature in 2026. The governing agreement for this project made Dauphin Deposit Bank (later Allfirst Bank) the trustee of the funds, and Appellee, Program Administration Services, Inc., the program administrator. The Authority began a similar program in 1997, known as "School Pool II," with $250 million from the public sale of tax-exempt 35–five year bonds set to mature in 2032. A similar agreement made Commerce Bank the trustee and, again, made Appellee the program administrator.[3]

---

**2.** Act of May 2, 1945, P.L. 382, No. 164, §§ 1–19 (as amended, 53 P.S. §§ 301–322). The act was recodified and replaced by the Act of June 19, 2001, P.L. 287, No. 22, § 1 (as amended, 53 Pa.C.S. §§ 5601–5623). With regard to the issues involved in this case, the current statute is substantively identical to the former one. *See* 53 P.S. § 306(B)(i) (repealed and recodified as amended at 53 Pa.C.S. § 5607(d)(12)).

**3.** At the time the 1986 agreement was executed, Appellee was conducting business as R.D. Fowler & Associates. It later changed its name to Program Administration Services, Inc., and is listed as such in the 1997 agreement.

Under both of these arrangements (the "Program Administration Agreements"), the bonds were purchased by private investors and the proceeds were used to create a "pool" of money that was available for the Authority to lend to qualifying school districts. The Authority lends money from these pools to school districts for dedicated purposes such as construction or reconstruction of school facilities, or debt refinancing. As school districts repay the principal and interest on their loans, interest is paid to the bondholders and principal is returned to the pool, from which it is available to be reloaned. The Authority thus provides "conduit" financing, as it is positioned between school-district borrowers and the private-investor lenders. As program administrator, Appellee is responsible, *inter alia*, to market the programs to prospective school districts, assist school districts with their applications, calculate note payments, bill the school districts, and assist the Authority in securing investment of funds with the trustee banks. The Program Administration Agreements provide that they shall continue in force until one of the following three conditions occurs: (1) no portion of the bonds remains outstanding and unpaid; (2) continuing failure of Appellee to perform in any material respect; or (3) mutual consent of the parties to terminate.

In November 2000, under a newly-appointed board of directors, the Authority notified Appellee that it intended to terminate the contracts without cause. Appellee initiated a declaratory judgment action in the trial court seeking a judicial determination that the contracts may not be terminated outside the terms specified by the agreements. The trial court ultimately entered a declaratory judgment in favor of the Authority, however, concluding that any agreements entered into by the parties or their predecessors were unenforceable as against the current Dauphin County General Authority. *See Program Admin. Services, Inc. v. Dauphin County Gen. Auth.*, No. 2992 S 2001 (C.P. Dauphin 2003).

On appeal, a divided, *en banc* panel of the Commonwealth Court reversed in a published decision. *Program Admin. Services, Inc. v. Dauphin County Gen. Auth.*, 874 A.2d 722

(Pa.Cmwlth.2005) (*en banc*). The majority reasoned that the central question was whether the Program Administration Agreements involved a governmental function or a proprietary function, because contracts involving governmental services may be terminated by a successor governing body, without cause, irrespective of the termination date or other procedures for termination set forth in the contract. *Id.* at 725 (citing *Lobolito, Inc. v. North Pocono Sch. Dist.*, 562 Pa. 380, 755 A.2d 1287 (2000)). The majority then stated that, in deciding whether the activity at issue was governmental or proprietary in nature, it should employ the test set forth in *County of Butler v. Local 585, Service Employees Int'l Union, AFL–CIO*, 158 Pa.Cmwlth. 519, 631 A.2d 1389 (1993). Under this test, a court considers whether the activity: 1) is one that government is not statutorily required to perform; 2) also may be carried on by private enterprise; or 3) is used as a means of raising revenue.

Applying this test to the present case, the majority held that the Authority's activity of lending money to school districts was proprietary in nature since the Authority was not statutorily required to perform the activity and it is one that is carried on by many private lenders. The majority explained that the "mere fact that the Authority lends money to a school district for school construction does not make the act of lending governmental in character any more than it would be if the loan was made by a private bank." *Program Admin. Services*, 874 A.2d at 728. Furthermore, the majority distinguished this Court's decision in *Lobolito*, on the basis that *Lobolito* involved the decision of whether to build a school building—a clear governmental function. In this case, however, the Authority is not involved in any decision to build schools, but only in financing such projects once the decision is made by another body. Likewise, the majority distinguished another Commonwealth Court case, *State Street Bank & Trust Co. v. Commonwealth*, 712 A.2d 811 (Pa.Cmwlth.1998), on the basis that the funds being lent in that case were assets of the state, whereas here they are assets of the bondholders, akin to

the holdings of private depositors. Thus, the majority reasoned:

> Although the School Pool programs unquestionably facilitate school construction projects and so serve a valuable public purpose, it is incontrovertible that financing of school construction does take place through private channels and would do so if the School Pool programs cease to exist.

*Id.* at 729.

Finally, the majority also agreed with Appellee's alternative argument that Section 5607(d)(12) represents a "statutory exception" to the general rule that current governing bodies may not bind successors with regard to governmental functions. *Program Admin. Services*, 874 A.2d at 729. Thus, by noting that, under Section 5607(d)(12) of the Municipality Authorities Act, administration agreements are statutorily permitted to be coextensive with the full maturity period of the bonds, the court deemed the Program Administration Agreements fully enforceable.

Judge Cohn Jubelirer authored a dissenting opinion, joined by Judge Pellegrini, in which she used the same test from *County of Butler*, but concluded that the conduit financing employed by the Authority is distinct from ordinary borrowing, since the funds were raised by the sale of bonds and the bondholders have no recourse against the Authority. Further, the ultimate borrowers are the school districts, the ultimate lenders are the bondholders, and unlike a private bank, the Authority earns no profit. She further noted that, in *Lobolito*, this court considered the "crux" of the agreement in resolving the governmental versus proprietary question, and *Lobolito* concluded that the "crux" of the agreement was the construction of a new school, and that the "services aspect of the agreement [i.e., that portion pertaining to water and sewage treatment] would be devoid of meaning without the school board's predicate promise to build the school." *Program Admin. Services*, 874 A.2d at 733 (Cohn Jubelirer, J., dissenting). Similarly, Judge Cohn Jubelirer opined that the "crux" of the Program Administration Agreements is the financing of new capital improvements for the public school system, which

is ancillary to the capital improvement projects themselves; therefore, in her view, they involve governmental functions.

In a separate dissent joined by Judge Cohn Jubelirer, Judge Pellegrini expressed discomfort with the idea that a public entity such as the Authority could be locked into a 40–year contract with a private party notwithstanding changes in the Authority's governing board and the concomitant new policies that the successor boards may wish to implement. He noted, in this regard, that the purpose of the rule allowing government entities to be free from long-term contracts entered into by their predecessor boards is to avoid such "capture" by private interests at the potential expense of public interests as ultimately expressed by the electorate through the ballot box. *See id.* at 730–31 (Pellegrini, J., dissenting).

Both the trial court and the Commonwealth Court panel concentrated their analysis primarily on the distinction between contracts relating to governmental functions and those pertaining to proprietary or business functions. Indeed, as noted by the Commonwealth Court majority and by this Court in *Lobolito, Inc. v. North Pocono Sch. Dist.,* 562 Pa. 380, 755 A.2d 1287 (2000), such a distinction has been recognized in Pennsylvania since the mid-Nineteenth Century. *See id.* at 384, 755 A.2d at 1289 (citing *Western Saving–Fund Soc'y of Phila. v. City of Phila.,* 31 Pa. 175, 183 (1858) (distinguishing governmental contracts, or contracts encompassing "things public," from proprietary contracts, or contracts encompassing "things of commerce")). Likewise, the parties presently open their arguments to this Court by reference to this consideration and differ chiefly in whether the functions performed by Appellee should be deemed governmental or proprietary in nature. *See* Brief for Appellant at 15–27; Brief for Appellee at 19–29.

The policy basis for the governmental-proprietary distinction, as developed in the common law of this Commonwealth, was discussed at length in *Lobolito,* in which the Court there undertook a historical survey, *see Lobolito,* 562 Pa. at 384–87, 755 A.2d at 1289–91, and recognized the underlying rationale as it had previously been expressed:

> The obvious purpose of the rule is to permit a newly appointed governmental body to function freely on behalf of the public and in response to the governmental power or body politic by which it was appointed or elected, unhampered by the policies of the predecessors who have since been replaced by the appointing or electing power. To permit the outgoing body to 'hamstring' its successors by imposing upon them a policy[-]implementing and to some extent, policy[-]making machinery, which is not attuned to the new body or its policies, would be to most effectively circumvent the rule.

*Id.* at 385, 755 A.2d at 1289–90 (quoting *Mitchell v. Chester Housing Auth.*, 389 Pa. 314, 324–25, 132 A.2d 873, 878 (1957)). *Lobolito* also noted that the rule's only exception recognized at common law pertains to situations in which "considerations of urgency and necessity, especially when coupled with the stipulated public interest and absence of bad faith or ulterior motivation," militated in favor of upholding the contract at issue. *Id.* at 386, 755 A.2d at 1290 (quoting *MacCalman v. County of Bucks*, 411 Pa. 316, 321, 191 A.2d 265, 267 (1963)).

█ Thus, the precept that governmental contracts are voidable in some range of circumstances is a common-law rule premised upon considerations of public policy. In applying this principle, however, courts should not lose sight of the respective roles of the General Assembly and the courts in terms of establishing public policy. In particular, it is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations. *See generally Parker v. Children's Hosp. of Philadelphia*, 483 Pa. 106, 116, 394 A.2d 932, 937 (1978) (explaining that "the power of judicial review must not be used as a means by which the courts might substitute [their] judgment as to the public policy for that of the legislature"). Accordingly, with the common-law framework as a backdrop, and absent constitutional infirmity, the Legislature may nonetheless modify the approach in particular sets of circumstances. *See generally Hilkmann v. Hilkmann*, 579 Pa. 563, 578–79, 858 A.2d 58, 68 (2004); *Scheipe v. Orlando*, 559 Pa. 112, 116, 739 A.2d 475, 477

(1999); *Gingold v. Audi–NSU–Auto Union, A.G.*, 389 Pa.Super. 328, 348, 567 A.2d 312, 323 (1989) ("The function of the common law is to fill the interstices left by the legislatures." (quotation marks omitted)). This is undoubtedly what the Commonwealth Court panel meant by the term, "statutory exception."

The Commonwealth Court previously recognized this principle in *Chichester Sch. Dist. v. Chichester Educ. Ass'n*, 750 A.2d 400, 403 (Pa.Cmwlth.2000), where it upheld certain holdover collective bargaining agreements entered into by a predecessor school board as against its successor board by relying upon the statutory authority for such agreements contained in the Public Employee Relations Act. The court acknowledged that the previous board's actions were governmental in character, but continued:

> Here, the contracts executed between the Board and the [employee organizations] were actually ratified by the Board at public hearings approximately two years prior to the election and seating of the successor Board members. Sections 701 through 904 of the Public Employee Relations Act (PERA) provide the Board members with the statutory authority to engage in negotiations and execute such contracts with employee organizations.

*Id.* at 404 (footnotes omitted); *see also Falls Township v. Scally*, 115 Pa.Cmwlth. 56, 59, 539 A.2d 912, 914 (1988) ("If Scally was performing a governmental function, then, *absent a statute to the contrary*, the outgoing Board of Supervisors had no authority to tie the hands of its successors." (emphasis added)); *Altoona Hous. Auth. v. City of Altoona*, 785 A.2d 1047, 1053 (Pa.Cmwlth.2001) ("The Court agrees with the Housing Authority as to the vitality of the general principle that a board exercising legislative authority lacks the power to bind its successors as to governmental functions. Nevertheless, specific statutory provisions may affect the analysis in particular situations." (citations omitted)).

As applied here—and as noted above—the General Assembly has expressly authorized municipality authorities "to make agreements with the purchasers or holders of [au-

thority] bonds or with others in connection with any bonds ... as the authority shall deem advisable," 53 Pa.C.S. § 5607(d)(12); *see also id.,* § 5607(d)(6) (enabling municipality authorities to "finance projects by making loans, which may be evidenced by and secured as may be provided in loan agreements, mortgages, security agreements *or any other contracts,* instruments or agreements, which contracts, instruments or agreements may contain such provisions as the authority shall deem necessary or desirable for the security or protection of the authority or its bondholders" (emphasis added)). These provisions embody a legislative policy decision favoring predictability, stability, and certainty with regard to some range of matters connected with public bond issues by municipality authorities. Because bond terms may be as long as forty years, these provisions authorize the execution of contracts that outlast the terms of the individual board members who approve the contracts, which are generally limited to five years. *See* 53 Pa.C.S. § 5508(b). To the extent this legislative policy is in tension with the competing common-law concern relating to the freedom of a new board to respond to popular pressures, the latter must yield to the former. For purposes of this inquiry, then, we must determine whether the Program Administration Agreements constitute agreements "in connection with" the Authority's 1986 and 1997 bond issues for purposes of Section 5607(d)(12).[4]

█ We find that they do. Although the Authority extensively develops that the agreements are not directly intertwined with, or validated by, the 40–year bond issues authorized by Section 5607(d)(12), *see* Brief for Appellant at 28, the statutory language does not contemplate such specific intertwining with, or validation by, particular documents. Rather, the same passage that enables bond issues, Section 5607(d)(12), also authorizes contracts "with others in connection with" such bonds, as set forth above. The most reason-

---

4. The issue is preserved for our consideration because Appellee highlighted the statutory authorization in its underlying action, *see* First Amended Complaint at ¶ 4, RR. 2a–3a, raised the issue before the Commonwealth Court, *see Program Admin. Services,* 874 A.2d at 729, and repeats its argument to this Court. *See* Brief for Appellee at 30–33.

able conclusion is that a contract under which an entity, such as Appellee, is to provide support for the administration of a bond program—including marketing the bonds to school districts and investing the funds on deposit with a trustee—is an agreement "with [another] in connection with" the bond issue.[5,6]

Relatedly, the Authority also urges that the trust indenture documents that secure the bonds make no commitment to the duration of Appellee's services as program administrator, but rather, define that term to include "any other person appointed by the Authority, from time to time, to administer the Program...." Trust Indenture, dated July 1, 1986, at 15; *see* RR. 280a. The Authority suggests that this and other provisions of these documents clearly refrain from granting any rights to Appellee to continue as administrator indefinitely, and correspondingly, give the Authority the discretion to replace Appellee at will. In this respect, the Authority also notes that nothing in Section 5607(d)(12) requires the term of a program administrator to be coextensive with the maturity date of the issued bonds.

■ While we agree that the statute does not require such coextensiveness, the Legislature would not need to require long-term contracts in order to authorize municipality authorities to enter into legally-binding, long-term contracts; it needed only to authorize them. Additionally, we have no present occasion to consider whether a proper interpretation of the specific provisions of the indenture agreements and/or the

5. The dissent indicates that our understanding of the word "others" within the statutory phrase, "to make agreements ... with others in connection with any bonds," is overly broad, and would apparently constrain its meaning to the trustee banks. *See* Dissenting Opinion, at 1022. We may assume, however, that if the Legislature had intended so specific a limitation, it would have said so. Moreover, unlike the dissent, we do not view the promotion of predictability, stability, and regularity as to such agreements as "vitiating the Authority's ability to carry out its governmental functions." *Id.* at 200 n. 1, 928 A.2d at 1022 n. 1.

6. This conclusion is not intended to imply any predicate finding by this Court that the Program Administration Agreements embody governmental functions. Rather, the point here is that the existence of statutory authorization for the contracts eliminates the need to distinguish between governmental and proprietary functions.

Program Administration Agreements would affirm that Appellee was intended to be replaceable at the Authority's sole discretion. Based on the questions framed in the Authority's Petition for Allowance of Appeal, review in this case is limited to whether conduit financing services constitute a governmental activity; whether the mere existence of statutory authority for long-term contracts ancillary to financing by a municipality authority make administrative service contracts enforceable against the Authority's subsequent governing boards; and whether the agreements should be deemed unenforceable as against public policy. *See* Petition for Allowance of Appeal at 6. In answering the second question affirmatively, the first was rendered moot. *See supra* note 6. As to the third, we have already observed that the General Assembly's policy choices as reflected in the statute are controlling.[7]

This is not to say that there can never be circumstances under which a successor board of directors may avoid a contract held over from its predecessor, even where such a long-term contract is statutorily authorized. In this respect, it is relevant that the governmental-functions test was originally directed to bad faith efforts on the part of "lame duck" governing bodies to "handcuff" their successors. *Fraternal Order of Police, E.B. Jermyn Lodge No. 2, by Tolan v. Hickey*, 499 Pa. 194, 200, 452 A.2d 1005, 1008 (1982). *See generally Chichester*, 750 A.2d at 403 ("An outgoing board that attempts to create these types of long-term obligations . . . is commonly referred to as a 'lame duck' board."). In *Mitchell*, for example, the Housing Authorities Act provided for gubernatorial appointment of a majority of the Chester Housing

7. In forwarding its policy argument, the Authority asserts that Appellee's faulty business judgment has caused it to lose confidence in Appellee as administrator. Whether Appellee's alleged deficiencies in this regard would supply the Authority with cause under the terms of the Program Administration Agreements to terminate Appellee's role as administrator is a question that is not before us in view of the limited scope of this appeal. As discussed, we here determine only that the Program Administration Agreements constitute agreements "in connection with" the Authority's 1986 and 1997 bond issues for purposes of Section 5607(d)(12), and thus, assuming that their effective period extends beyond the term of the governing board that approved them, they are enforceable against successor boards.

Authority. When a new governor was elected, the prospect of a change in control of the board prompted the existing board to enter into a five-year employment contract with the secretary of the authority, a contract that this Court allowed the incoming board to avoid. *Compare Falls Township v. McManamon,* 113 Pa.Cmwlth. 504, 508–09, 537 A.2d 946, 947 (1988) (invalidating a holdover police-chief employment contract entered into by a lame-duck board of supervisors), *and Moore v. Luzerne County,* 262 Pa. 216, 220, 105 A. 94, 95 (1918) (denying recovery on a contract between a board of county commissioners and an engineer, where the contract was executed in bad faith just before the expiration of the commissioners' terms), *with Horvat v. Jenkins Township Sch. Dist.,* 337 Pa. 193, 10 A.2d 390 (1940) (upholding a supervising principal's employment agreement extending beyond the school board's term where the parties entered into the agreement in good faith well before the expiration of that term). Thus, nothing in this Opinion should be understood to foreclose the possibility that the avoidance of a holdover contract entered into in bad faith by an outgoing board may ultimately be upheld, notwithstanding the presence of legislation authorizing the making of the contract in the first instance. However, that situation is not presently before us.

For the foregoing reasons, the judgment of the Commonwealth Court is affirmed.

Chief Justice CAPPY and Justices CASTILLE, BAER and FITZGERALD join the opinion.

Justice EAKIN files a concurring opinion.

Justice BALDWIN files a dissenting opinion.

### CONCURRING OPINION

Justice EAKIN.

I agree with the majority's decision to affirm the Commonwealth Court's order because the statutory scheme authorizes long-term contracts; however, I believe in order to enter into contracts that bind successor boards, there must be an ongoing benefit to the municipality.

The Pennsylvania Municipality Authorities Act allows the Authority "to make agreements with the purchasers or holders of the bonds or with others in connection with any bonds. . . ." 53 Pa.C.S. § 5607(d)(12). These agreements can be made up to 40 years in duration. *Id.* However, because the agreement with Appellee is solely for the administration and marketing of the bond program to school districts and not affiliated with the issuance or servicing of bonds, it falls outside the scope of § 5607(d)(12) and is more akin to an employment contract. Such a contract with Appellee violates the public policy against permitting a governmental entity to bind its successors in pursuing its governmental functions. *See Commonwealth ex rel. Fortney v. Bartol,* 342 Pa. 172, 20 A.2d 313, 314 (1941) ("[A] municipal board having legislative authority . . . cannot enter into a contract which will extend beyond the term for which the members of the body were elected."). Nevertheless, as the majority suggests, long-term contracts are authorized and will be upheld absent a showing of bad faith. Majority Op., at 196–97, 928 A.2d at 1020–21.

In addition to the good faith inception of the contract, I believe a benefit to the municipality must also result from the contract to justify binding successor boards into such agreements. Here, the Authority did not earn a profit pursuant to its "conduit financing," but it is unclear whether there was any benefit, financial or otherwise, to the municipality through the continued use of Appellee's services. It cannot be that the statute allows an out-going board to bind the municipality to 40 years of a one-sided agreement. I do not suggest this was such a deal, the record being bereft of evidence one way, or the other. Therefore, I would remand the case to the trial court for an evidentiary hearing to determine the benefit, if any, to the municipality through upholding the contract with Appellee.

### DISSENTING OPINION

Justice BALDWIN.

I respectfully dissent. I disagree with the majority's conclusion that section 5607(d)(12) of the Pennsylvania Municipali-

ty Authorities Act constrains the Authority to maintain contracts with the Appellee which are related to the governmental functions of the Authority. The Act permits Authorities to incur long-term indebtedness for up to 40 years through the issuance of bonds, and to contract with private entities in connection with these bond issuances. The purpose of the Act is to further the public policy of making low-cost, long-term funds available to government entities for public projects; and the contracts that it contemplates are those with bond investors. This is clear from the legislative statement that a purpose of the statute is to "provide for the security of the bonds and the rights of the bondholders." 53 Pa.C.S. § 5607(d)(12) (Purposes and Powers).

The majority interprets the language of the statute, that municipal authorities may make agreements with the purchasers or holders of bonds "or others in connection with any bonds," to include even the type of program administrative contract at issue here. I do not agree that this statutory enactment encompasses contracts with entities such as the Appellee, who by their own admission carry out functions that are merely ministerial and ancillary to the primary business of securing financing for schools. I believe that this provision applies to contracts with bond investors, or trustee banks, which would be consistent with the purpose of the statute to ensure the security of bondholder's rights. The majority subscribes to an overbroad interpretation of this language to apply it to any contract that the Authority executes relating to School Pool program administration. This interpretation would be anathema to the expressed legislative purpose that long-term contracts are permitted to ensure the security of bondholders, and is not consistent with the frequently expressed public policy of permitting governmental entities to disavow contracts relating to governmental functions that their predecessors have enacted.

Nothing in the contract between the Authority and the Appellee impairs, or indeed even affects, bondholder rights. Moreover, 53 Pa.C.S. § 5617 states, "the Authority shall not be authorized to do anything which will impair the security of

the holders of the obligations of the Authority or violate any agreements with them or for their benefit." This language underscores that the Act is intended to ensure that no contract with *bondholders* may be terminated. I cannot subscribe to the majority's view that the program administration agreements are equivalent in importance to the financing or security documents that are contemplated by the language of the Act, as they are not connected with the issuance or servicing of bonds.[1]

Consequently, I believe this Court is required to address the central issue of this case, *i.e.* whether a municipal authority, in issuing tax-exempt revenue bonds for the use of school districts to build and finance public school buildings, is performing a governmental or a proprietary function.[2] If the function is governmental, the board of the Authority may not bind successor Boards to long-term contracts entered into for the administration of such bond programs, in contrast to the generally binding nature of long-term contracts of non-governmental entities. The rationale for the rule is that newly appointed or elected governmental figures should be responsive to their electorate or appointing bodies, rather than to their predecessors' contractual partners. I would hold that the "conduit financing" bond program at issue in this case is a governmental function, and that the Authority is thus permitted to terminate its contract with the Appellee.

The doctrine that governmental entities may not contract with others beyond their term of office in the exercise of their governmental functions has a convoluted history. It has changed continuously as political approaches to local governmental powers have changed and has been the subject of much

1. While it is true, as the majority points out, that the Legislature's function is to set public policy, the statute in question does not embody the public policy of vitiating the Authority's ability to carry out its governmental functions, but merely permits municipal authorities to enter into contracts. I do not subscribe to the majority's opinion that the current statute alters the general rule that contracts are voidable if they concern an Authority's governmental functions.

2. A proprietary function is a business function that may be performed by governments but is also performed by private enterprises.

confusion and disparate application in our state and federal courts. Indeed, as we stated in *Morris v. Sch. Dist. of Twp. of Mount Lebanon*, 393 Pa. 633, 637–38, 144 A.2d 737, 739 (1958): "Perhaps there is no issue known to the law which is surrounded by more confusion than the question whether a given municipal operation is governmental or proprietary in nature." [3] The doctrine causes friction between two important public policies, namely: (1) the expectation that contracts will be performed and not abrogated; and (2) the sovereignty of governments in performing their essential functions to promote public health, education and welfare. While the balancing of these competing interests has been inconsistent, no federal or state court has been able to create a viable alternative approach.[4]

Despite the competing interests involved, the rule that an authority or governmental entity may not bind its successors in pursuing its governmental functions has been expressed over decades in this Commonwealth, and is succinctly explained in *Commonwealth ex rel. Fortney v. Bartol*, 342 Pa. 172, 20 A.2d 313 (1941):

> In the performance of sovereign or governmental, as distinguished from business or proprietary, functions, no legislative body, or municipal board having legislative authority, can take action which will bind its successors. It cannot enter into a contract which will extend beyond the term for which the members of the body were elected.

*Id.* at 175, 20 A.2d at 314 (citations omitted).

The question of whether a municipal authority is acting in a governmental capacity has resisted a simple response. A useful starting point in this analysis is our decision in *Mitchell v. Chester Hous. Auth.*, 389 Pa. 314, 321, 132 A.2d 873, 876 (1957). In *Mitchell*, our Court discussed the considerations

**3.** In *Morris* we discussed this issue in the context of governmental immunity which we later eliminated in *Ayala v. Philadelphia Bd. Of Public Ed.*, 453 Pa. 584, 305 A.2d 877 (1973), thus overruling *Morris* on other grounds.

**4.** For a discussion of the history and application of the doctrine, *see* Janice C. Griffith, *Local Government Contracts: Escaping from the Governmental/Proprietary Maze*, 75 Iowa L.Rev. 277 (1990).

present in analyzing contracts "relating inseparably to the overall functioning of a public body." *Id.* As we noted there, inasmuch as municipal authorities are instrumentalities of government, they are agencies that perform governmental functions although they may also perform proprietary functions. *Id.* at 320, 132 A.2d at 876. In *Mitchell,* we held that a municipal housing authority performed governmental functions in pursuance of the Housing Authorities Act then in place (35 P.S. § 1541 *et seq.*), including responsibility to clear substandard housing and plan and reconstruct safe and sanitary housing for low-income people.

Our Court continued the governmental-proprietary function discussion in *Lobolito, Inc. v. North Pocono School Dist.,* 562 Pa. 380, 755 A.2d 1287 (2000). In *Lobolito,* a school district entered into an agreement with a private developer to build a sewage treatment plant in connection with the planned construction of a school. When a successor school board decided that the school would not be built, the school district disavowed its agreement with the sewage treatment plant developer. The developer brought suit to recover costs incurred in preparation for construction. Our Court undertook a detailed analysis of the distinction between governmental functions and proprietary functions in agreements with governmental bodies. We wrote:

> This Court has long viewed agreements involving governmental bodies in a different light than agreements made exclusively between private parties. Since the mid-nineteenth century, we have distinguished between agreements encompassing governmental functions of governing bodies from agreements encompassing proprietary or business functions. *See Western Saving Fund Soc'y of Philadelphia v. City of Philadelphia,* 31 Pa. 175, 183 (1858) (distinguishing governmental contracts or contracts encompassing "things public," from proprietary contracts, or contracts encompassing "things of commerce").

*Lobolito,* 562 Pa. at 384, 755 A.2d at 1289. In determining how to interpret the agreement to construct the sewage plant, our Court in *Lobolito* noted the importance of examining the

"crux" of the Agreement, which was not to build a sewage treatment plant, but to construct a new school. We noted "[t]he creation and operation of public schools have traditionally been governmental functions in Pennsylvania." *Id.* at 388, 755 A.2d at 1291.

Without descending too deeply into the quagmire of the governmental/proprietary debate, I believe that the ability to issue tax-exempt bonds for the purpose of constructing new public schools, or allowing public school districts to refinance existing debt, is a governmental function that a private enterprise could not undertake. The purpose of School Pool I and School Pool II was to assist school districts within Dauphin County to obtain financing for capital improvements or new construction of schools. The bondholders, or lenders, received tax-exempt interest on the bonds. The borrowers, or school districts, received the benefit of lower cost borrowing than if they issued the bonds themselves because of shared economies with regard to the administration of the program. The Authority acted as a conduit between the two for the benefit of the school districts, and did not earn a profit from the operation of the program. Notably, as an instrumentality of state government, the bonds issued by the Authority are tax exempt. Tax-exempt financing can also be accomplished if individual school districts issued the bonds themselves, but cannot be accomplished by a private bank, bond underwriter or other non-governmental entity. Lending money that comes from the purchase of tax-exempt bonds to school districts to build schools is simply not a proprietary function, as it could not be carried out by private businesses. Moreover, the bond revenue was being used exclusively for public purposes.

For the foregoing reasons, I believe that the majority erred in finding that the Act precludes our Court from addressing the primary issue in this case, and that had the majority addressed it, it would have been required to conclude that the Authority's tax-exempt bond financing programs are governmental functions.