992 A.2d 859

**Alan TANNENBAUM, M.D., Appellee**

v.

**NATIONWIDE INSURANCE COMPANY, Appellant.**

Supreme Court of Pennsylvania.

Argued April 16, 2008.

Decided April 28, 2010.

James C. Haggerty, Swartz Campbell LLC, Philadelphia, Allan D. Goulding, Jr., Curtin & Heofner, L.L.P., for Nationwide Insurance Company.

Kenneth Scott Saffren, Richard Alex Wolfe, Saffren & Weinberg, Jenkintown, Leonard A. Sloane, Eckell, Sparks,

Levy, Auerbach, Monte, Rainer, Sloane, Matthews et al., Media, for Alan Tannenbaum.

Craig R.F. Murphey, Catherine Moodey Doyle, MacDonald, Illig, Jones & Britton, L.L.P., Erie, for amicus curiae Pennsylvania Defense Institute.

Mitchell S. Clair, Lafayette Hill, Donald F. Manchel & Associates, Scott B. Cooper, Schmidt Kramer, P.C., Harrisburg, for amicus curiae Pennsylvania Association for Justice.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, JJ.

## *OPINION*

Justice SAYLOR.[1]

This appeal requires assessment of the scope of an offset provision of the Motor Vehicle Financial Responsibility Law.

In December 2000, Alan Tannenbaum, M.D. ("Appellee"), suffered severe injuries in a motor vehicle accident, rendering him permanently disabled from his previous hospital employment. In addition to Social Security disability payments, Appellee applied for and received income-loss benefits under a group plan provided by the hospital, as well as further benefits pursuant to two personal disability policies. He also commenced a civil action against the driver of a truck involved in the accident and his employer, and a substantial monetary settlement was consummated.

Subsequently, Appellee sought to recover income-loss benefits under the underinsured motorist ("UIM") provisions of an applicable vehicle policy issued by Appellant, Nationwide Insurance Company ("Nationwide"). Nationwide countered that it was entitled to offset the benefits Appellee received under his group plan and personal disability policies.

In support, Nationwide invoked Section 1722 of the Motor Vehicle Financial Responsibility Law,[2] entitled "Preclusion of recovering required benefits," which provides:

---

1. This matter was reassigned to this author.

2. Act of Feb. 12, 1984, P.L. 26, No. 11 (as amended 75 Pa.C.S. §§ 1701–1799.7) (the "MVFRL").

> In any action for damages against a tortfeasor, or in any uninsured or underinsured motorist proceeding, arising out of the maintenance or use of a motor vehicle, a person who is eligible to receive benefits under the coverages set forth in this subchapter, or workers' compensation, or any program, group contract or other arrangement for payment of benefits as defined in section 1719 (relating to coordination of benefits) shall be precluded from recovering the amount of benefits paid or payable under this subchapter, or workers' compensation, or any program, group contract or other arrangement for payment of benefits as defined in section 1719.

75 Pa.C.S. § 1722. According to Nationwide, the statute required an offset favorable to UM/UIM insurers for monies recovered by the insured as first-party benefits and/or which had historically been subject to subrogation. In the latter regard, Nationwide highlighted an interrelated provision of the MVFRL, Section 1720, which curtails subrogation relative to such funds. *See* 75 Pa.C.S. § 1720 (providing, in relevant part, that "there shall be no right of subrogation or reimbursement from a claimant's tort recovery with respect to ... benefits paid or payable by a program, group contract or other arrangement whether primary or excess under section 1719 (relating to coordination of benefits)").

Nationwide also relied on a decision of the federal district court sitting in its diversity jurisdiction, *Austin v. Dionne*, 909 F.Supp. 271 (E.D.Pa.1995), which sanctioned a Section 1722 disability-benefit offset against a plaintiff's recovery under his automobile insurance policy. *Austin* reasoned that Section 1722 "reflects the Pennsylvania legislature's goal of preventing double recovery from both an employer's disability insurance fund and a tortfeasor." *Id.* at 275. Nationwide took the stance that Appellee's receipt of disability benefits similarly overlapped with his UIM claim, thereby amounting to an attempt—as Nationwide put it—to "double dip."

Appellee countered that recovery of benefits for which he paid (or otherwise contributed to premiums) did not represent a double recovery, and such benefits were not subject to

Section 1722 offset. In support of his position, Appellee relied substantially on the rationale of *Panichelli v. Liberty Mut. Ins. Group*, 543 Pa. 114, 669 A.2d 930 (1996).

As relevant to Appellee's position, *Panichelli* held that sick pay and Social Security disability benefits received by a policyholder could not be deducted by an insurer in calculating the insured's "actual loss of gross income" under the first-party-benefits provisions of the MVFRL contained in its Section 1712(2), 75 Pa.C.S. § 1712(2). The Court reasoned that, in light of the insured's contribution to payment for these benefits, they were to be considered "in excess of, and not in duplication of, the income loss benefits payable under § 1712(2)." *Panichelli*, 543 Pa. at 118, 669 A.2d at 932; *see also id.* ("Panichelli's receipt of both employer provided sick leave benefits and social security disability benefits ... does not result in 'double dipping.' These are benefits for which the employee has paid in the form of lower wages for the sick leave benefits and in the form of payroll deductions for the social security benefits."); 75 Pa.C.S. § 1719(a) ("Any program, group contract or other arrangement for payment of benefits such as described in [the first-party provisions, including Section 1712,] shall be construed to contain a provision that all benefits provided therein shall be in excess of and not in duplication of any valid and collectible first party benefits...."). Furthermore, Appellee observed, *Panichelli's* rationale had been extended by the intermediate appellate courts to a variety of contexts. *See Browne v. Nationwide Mut. Ins. Co.*, 449 Pa.Super. 661, 666–67, 674 A.2d 1127, 1129–30 (1996) (referencing *Panichelli's* contribution-based reasoning in holding that Social Security disability benefits are not subject to Section 1722 offset, albeit advancing a primary rationale resting on the recognition that such benefits were not subject to subrogation in the first instance); *Carroll v. Kephart*, 717 A.2d 554, 558 (Pa.Super.1998) (indicating that, pursuant to *Panichelli* and *Browne*, "benefits for which a plaintiff has paid for or earned through his employment are not within the purview of § 1722 and the receipt of those benefits do[es] not constitute a double recovery").

Two of three members of the panel of arbitrators selected to resolve the parties' dispute agreed with Nationwide, with the chairperson referencing *Austin's* rationale in support of the majority position. Thus, although the panel rendered an award of approximately $1.9 million in Appellee's favor, it also implemented an offset, favorable to Nationwide, reflecting the nearly one-million dollars in disability benefit payments Appellee had received under his employer plan and personal policies. Contesting this offset, Appellee filed a petition to set the award aside in the common pleas court, acting as a statutory appeals court.

Upon its review, the court found the offset to have been improper and vacated the arbitrators' award. It reasoned that the arbitrators erroneously relied upon *Austin,* whereas they should have followed the *Panichelli* line, particularly *Carroll,* as these matters all were decided after *Austin.*

On Nationwide's subsequent appeal, the Superior Court affirmed in a published opinion, *see Tannenbaum v. Nationwide Ins. Co.,* 919 A.2d 267 (Pa.Super.2007), upon a rationale tracking Appellee's position. According to the court, Nationwide's arguments confused the impermissible double recovery of overlapping benefits with the permissible recovery of excess ones. *See id.* at 269. The Superior Court observed that the relevant disability policies were defined, on their terms and by statute, as affording "excess" benefits, and that excess insurance, by its nature, " 'provide[s] protection to the insured in addition to other coverage which might be available to him.' " *See id.* at 270 (quoting *Conn. Indem. Co. v. Cordasco,* 369 Pa.Super. 439, 443, 535 A.2d 631, 633 (1987) (quoting, in turn, *Ins. Co. of N. Am. (INA) v. Cont'l Cas. Co.,* 575 F.2d 1070, 1072 (3d Cir.1978))). Moreover, the court extended the *Panichelli* paid-for litmus into the Section 1722 context. *See id.* at 270–71 (citing *Panichelli, Browne,* and *Carroll* ).[3] According to the court:

3. In addition, the court referenced *Ricks v. Nationwide Insurance Company,* 879 A.2d 796, 801 n. 8 (Pa.Super.2005) (holding that a claimant's recovery of uninsured motorist benefits was not duplicative of benefits received under his employer's workers' compensation coverage), and

All of these cases involve types of personally paid insurance different than that of [a]ppellee herein, and [a]ppellant insists that the holdings in each are limited to the specific type of excess insurance considered. We are not persuaded, as the overarching principle remains constant: where the personal policies resorted to are both separate from UIM, or UM, coverage, and paid for exclusively by the claimant either directly, or through payroll deductions which result in lower wages, payments received from these coverages do not duplicate benefits under the MVFRL as they are fundamentally different from those benefits.

\* \* \*

Should [Nationwide's] argument prevail, insurance companies, not claimants, would receive a windfall, as premiums for excess coverage would have been paid to no avail; no benefit could accrue since any recovery other than UIM payments would perforce be designated "double." Such a result would offend not only the statute but public policy.

*Id.* at 271.

On Nationwide's petition, we allowed appeal to consider whether the Superior Court and the common pleas court correctly interpreted Section 1722.

■ Presently, Nationwide maintains that the plain language of Section 1722–"a person who is eligible to receive benefits under ... *any* program, group contract or other arrangement for payment of benefits ... *shall be precluded* from recovering the amount of benefits paid or payable [thereunder]"—must control. 75 Pa.C.S. § 1722 (emphasis added). Nationwide asserts that the dramatic alteration of the UM/ UIM landscape reflected in Section 1722 was designed to eliminate double recoveries in automobile accident litigation, thus remediating spiraling insurance costs plaguing the driving public. *See, e.g.,* Brief for Nationwide at 7 ("The 'double

*Standish v. American Manufacturers Mutual Insurance Company,* 698 A.2d 599, 601 (Pa.Super.1997) (holding that a claimant's receipt of benefits pursuant to his own automobile insurance policy did not duplicate workers' compensation benefits and, accordingly, was not subject to subrogation).

dip' in automobile accident claims was a primary force in the upward escalation of costs. The [MVFRL] was enacted to specifically remedy this problem."). According to Nationwide, the statute's thrust lies in the elimination of the collateral source rule in automobile tort and insurance litigation.[4] Such effect, Nationwide explains, is reflected not only in Section 1722's plain terms, but also in the preclusion of subrogation under the interrelated provisions of Section 1720. *See* Brief for Nationwide at 15 ("Subrogation is premised upon duplicate recovery. Section 1722 eliminated the 'double dip'. Section 1720 maintained the balance and equilibrium by similarly abrogating subrogation.").

Nationwide portrays the Superior Court's holding as embodying a judicially-created, rule-swallowing exception which wholly undermines the legislative reform efforts embodied in the MVFRL. *See, e.g.,* Brief for Nationwide at 7–8 ("The system adopted by the [Superior] Court abandons a hallmark of the reform effort, namely the § 1722 preclusion, thereby reinstituting the 'double dip' in motor vehicle cases.").[5] It is

4. Generally, where it remains applicable, the common-law collateral source rule directs that payments from a collateral source shall not diminish the damages otherwise recoverable from the wrongdoer. *See Johnson v. Beane*, 541 Pa. 449, 456, 664 A.2d 96, 100 (1995).

5. In discussing the scale of the impact of the Superior Court's decision, Nationwide posits that the "paid-for" litmus reflected therein can be invoked by claimants in a wide range of circumstances. In particular, it explains:

In the work environment of the 21st Century, virtually every benefit plan available to a person is either provided by an employer or purchased by the individual. In many circumstances plans offered by employers require some contribution from the employee, contain significant co-pays, or both. The ruling of the Superior Court in the case at bar declares that any benefit that is paid for by an individual or which is afforded to him or her in lieu of compensation is not [to] be subject to the § 1722 preclusion. In the modern workplace essentially every benefit afforded an individual is thus excluded from § 1722. In reality, under the rationale of the Superior Court, there are no benefit plans which would be subject to § 1722.... Thus, an automobile accident victim, under this decision, can recover lost wages from "a program, group contract or other arrangement," and then recover those same amounts from the tortfeasor in the third party action or the insurer in the UM or UIM proceeding, with no subrogation right to be satisfied. This is precisely the type of double recovery which the MVFRL sought to preclude.

Nationwide's position that such holding is also perverse, as it permits duplicative recoveries of income losses, while leaving intact the prohibition against subrogation designed as a coordinate restriction. *See* Brief for Nationwide at 19. Nationwide distinguishes the *Panichelli* line of cases as pertaining to first-party claims, where the focus is upon the source of premium payments; whereas, in the tort and UM/UIM scenarios, under the plain terms of Section 1722, the source of such payments is irrelevant. Nationwide also refutes the Superior Court's allusion to insurer windfalls, explaining that policyholders do not purchase a right to "double dip." *See, e.g., id.* at 33.

Appellee, on the other hand, advances the position previously vindicated in the prior reviewing courts. Specifically, he maintains that disability benefits paid for by an insured, and/or earned through his employment, are fundamentally different from benefits under the MVFRL and do not raise the specter of double recovery or qualify for Section 1722 offset. *See* Brief for Appellee at 13 ("Stated another way, the MVFRL was not intended to give an insurer the benefit of a collateral source paid for out of pocket by a victim of another's negligence."). Additionally, the *Panichelli* line of decisions continues to play a prominent role in Appellee's present contentions. *See, e.g.,* Brief for Appellee at 16 ("Since the inception of the MVFRL, the Supreme Court and the Superior Court have permitted recoveries without an offset and/or credit even in situations where the benefits could have been construed as falling within the purview of the MVFRL.... [These] consistent decisions ... have not resulted in escalating insurance premiums and/or the destruction of the MVFRL.").

In responding to Nationwide's arguments, Appellee downplays the overall cost-containment objective of the MVFRL, contending that the statute's main purpose was to deter drivers from failing to insure their vehicles. He also indicates that, when interpreting the MVFRL, courts are bound to apply the construction most favorable to the affordance of

Brief for Nationwide at 20.

coverage for the insured. *See id.* at 13 (citing *Danko v. Erie Ins. Exch.,* 428 Pa.Super. 223, 630 A.2d 1219 (1993), *aff'd,* 538 Pa. 572, 649 A.2d 935 (1994) (*per curiam* )). Both Appellee and its *amicus,* the Pennsylvania Association for Justice, reassert their perspective that Nationwide is improperly attempting to secure a windfall. *See, e.g.,* Brief for Appellee at 23 ("It is undisputable that Appellant, Nationwide, did not contemplate any of the disability policies in underwriting the coverages purchased by [Appellee], nor did Appellant, Nationwide, reduce [Appellee's] premiums as a result of his separate purchase of disability benefits.").

Appellee also indicates that offset would lead to unfair setoffs for other benefits and create untenable uncertainties in matters governed by the MVFRL. In this regard, he hypothesizes many ripple effects of enforcing Section 1722 on the terms advocated by Nationwide. For example, Appellee contends that such a holding would reward insureds who fail to secure adequate insurance and/or apply for disability benefits after accidents in a timely manner, while punishing those who act responsibly. *See, e.g.,* Brief for Appellee at 33 ("Stated another way, Nationwide's position would make a claimant more secure in recovery of future lost wage benefits if they failed to have disability insurance."). He also forecasts that a holding favorable to Nationwide's position would encourage UM/UIM carriers to delay investigations and settlements to await decisions from disability carriers. *See id.* (predicting "years of tortured litigation between claimants and their insurance company, undeniably resulting in higher costs to both insurers and insureds").

Appellee recognizes the seriousness of the social-policy issues faced by the General Assembly in its efforts to reform automobile-insurance law; nevertheless, he attempts to confine the discussion of such concerns to the arena of medical insurance. *See, e.g.,* Brief for Appellee at 34 ("As was persuasively posited to the Court by the [a]ppellee in [*Panichelli* ] perhaps the most scandalous aspect of the No–Fault Act was the ability of an individual to receive medical treatment paid for by their work-related health insurance carrier, and then to

turn the bills over to their automobile carrier for payment directly to the insured."). According to Appellee, disability benefits simply are not of a group/program/arrangement type for purposes of Section 1722, and such classification is restricted to the health-related benefits referenced in Section 1719(b). *See id.* at 34–35.

As a threshold matter, we consider whether Appellee's group plan and personal disability policies are group/program/arrangement vehicles for payment of benefits within the meaning of Section 1722. As noted, Appellee argues they are not, as the Legislature contemplated that Section 1722's reach would be limited to health insurance benefits. There are multiple difficulties with such position.

First, Appellee initially stresses that the relevant group plan and personal policies are of a group/program/arrangement type for purposes of Section 1719 in developing his position that disability benefits are to be deemed excess. *See, e.g.,* Brief for Appellee at 23 ("Based upon the language of § 1719(a), both the [group plan] and the private disability policy must be construed as providing benefits in excess of, and not in duplication of, the income loss benefits payable under § 1712(2)."). While it would not be impossible for the Legislature to use the same terms differently in two distinct provisions of a statutory scheme, here, the General Assembly expressly cross-referenced Section 1719 in Section 1722 as providing the definition for group/program/arrangement benefits. *See* 75 Pa.C.S. § 1722 (addressing group/program/arrangement benefits "as defined in section 1719"). Thus, the position that the terms should be construed differently as between the two sections is untenable.

Second, *Panichelli,* the decision principally relied upon by Appellee, specifically disapproves the position that Section 1719 is limited to health benefits. *See Panichelli,* 543 Pa. at 118, 669 A.2d at 932 (rejecting the argument that examples used in Section 1719(b) demonstrated a legislative intent to encompass only health care benefit plans within the definition of programs, while characterizing the reach of the group/pro-

gram/arrangement language as "extremely broad"); *accord Browne,* 449 Pa.Super. at 664–65, 674 A.2d at 1128 ("The *Panichelli* court concluded that § 1719 must be interpreted to take into consideration programs for the payment of income loss benefits.").

Finally, the history of Section 1722 confirms the Legislature intended to extend its reach beyond health benefits. In point of fact, the initial version of Section 1722, as enacted in 1984, was entitled "Preclusion of pleading and proving of required *medical* benefit," and the statute originally was so limited in substantive scope. Act of Feb. 12, 1984, P.L. 26, No. 11 § 3 (superseded) (emphasis added). The same day, however, an amended version of Section 1722 was passed which eliminated all references to medical benefits. *See* 75 Pa.C.S. § 1722, Historical and Statutory Notes.[6] To accept Appellee's position would be to undermine the obvious broadening effect of the substantial modification reflected in this removal of restrictive terms.

For the above reasons, there is no tenable basis to support limiting Section 1722's scope to health benefits or, conversely, the impact of Appellee's theory of a paid-for litmus to income-loss benefits. Accordingly, we hold that the relevant disability benefits received by Appellee fall within the group/program/arrangement classification for purposes of Section 1722.

Guiding our consideration of the remaining terms of Section 1722, it is axiomatic that exercises in statutory interpretation must entail close consideration of the express language of the governing statute. *See* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). As noted, Section 1722 prescribes, in relevant part: "[I]n any [UM/UIM] proceeding, ... a person who is eligible to receive benefits under ... *any* program, group contract or other arrangement for payment of benefits ... shall be precluded from recovering the amount of

6. A separate substantial restriction on Section 1722's reach was removed in 1990. *See id.*

[such] benefits[.]" 75 Pa.C.S. § 1722 (emphasis added). Once it is accepted that the relevant income-loss benefits received by Appellee fall within the group/program/arrangement classification, it becomes apparent that they are subject to the specified statutory offset. Facially, Section 1722 reflects the Legislature's intent to shift a substantial share of the liability for injuries caused by uninsured and underinsured motorists from automobile insurance carriers to collateral source providers (many of which previously held subrogation interests), obviously with the aim to reduce motor vehicle insurance premiums. Whether or not this is wise social policy, manifestly, it is the policy presently reflected on the face of the MVFRL.[7]

In this regard, none of the reviewing courts, nor Appellee, has undertaken to reconcile a paid-for litmus, or a fact-based inquiry into the presence or absence of double recoveries, with Section 1722's specific directive that its prohibition and offset prescriptions apply relative to "*any* program, group contract or other arrangement for payment of benefits." 75 Pa.C.S. § 1722 (emphasis added).[8] Instead, the reviewing courts, and Appellee, have grounded their positions primarily on policy rationale deriving from *Panichelli*. As Nationwide stresses, however, *Panichelli* was not a UM/UIM case, and, thus, the express statutory prohibition of Section 1722 governing UM/UIM proceedings was not a relevant consideration and was not considered. To the extent the Superior Court in subsequent decisions has suggested that *Panichelli's* rationale

7. We recognize, as Appellee stresses, that the Legislature has clearly denominated group/program/arrangement benefits as excess. *See* 75 Pa.C.S. § 1719(a). Just as clearly, however, the Assembly has specifically provided that such benefits, while denominated "excess" in a first-party context, are included in the statutory offset formula in a tort or UM–UIM context. *See* 75 Pa.C.S. § 1722.

We also acknowledge the strength of Appellee's policy argument that he should receive what he has purchased, noting only that its force is diminished, at least to a degree, by the fact that insurance interests are frequently taken subject to contractual subrogation rights.

8. Appellee's position that Section 1722 is limited to healthcare benefits is the only argument that addresses this limitation. As developed above, however, we have found such argument to be untenable.

should be extended in a manner that undermines the plain terms of the governing statute, we now disapprove such reasoning.[9]

We are sensitive to the perspective that the above, straightforward reading of Section 1722 reveals that the Legislature has attacked the highly complex and nuanced problem of rising automobile insurance costs with a peculiarly blunt mallet.[10] In such a landscape, there are vast arrays of variables and effects attending the type of experimentation that has been undertaken by the Pennsylvania General Assembly and other legislative bodies in the tort and UM/UIM arenas in the pursuit of cost containment. For example, the availability and extent of collateral source benefits may differ enormously according to the terms of various policies, entitlements, and/or gratuities; such differences may present intricate questions concerning whether any particular resolution of multiple-benefit scenarios truly entails excessive recovery; one-size-fits-all responses may thwart excess recoveries in some circumstances and limit just compensation in others; contractual coordination of benefits, including the presence or absence of subrogation clauses in various collateral source vehicles, may complicate the subject of statutory coordination;[11] subroga-

9. Parenthetically, Section 1722 parallels the statutory curtailment of the common-law collateral source rule in the medical malpractice arena. *See* 40 P.S. § 1303.508(a) (providing, subject to limited exceptions, that "a claimant in a medical professional liability action is precluded from recovering damages for past medical expenses or past lost earnings incurred to the time of trial to the extent that the loss is covered by a private or public benefit or gratuity that the claimant has received prior to trial").

10. By way of a threshold example, a number of other jurisdictions have at least afforded plaintiffs the benefit of a credit for the premiums they paid to collateral-source providers. *See, e.g.,* Conn. Gen. Stat. § 52–225a(c) (2008).

11. The dissenting opinion relies greatly on Appellee's tender (actual and constructive) of premiums under the group plan and personal disability policies giving rise to a Section 1722 offset. Nevertheless, the dissent offers no account for the possibility that those premiums reflected contractual coordination and/or subrogation rights restricting the amount of benefits available to Appellee.

It is very difficult, on the record presented, to make a full assessment of such contractual coordination under the group plan and personal

tion interests, where they do exist, are frequently compromised to achieve prompt and certain resolutions, and thus, the elimination of subrogation does not necessarily represent a *quid pro quo* for the offset of benefits; ripple effects as forecast by Appellee, including tactical behavior on the part of litigants, may in fact ensue; and efforts to contain premiums by manipulating substantive outcomes may not ultimately have their desired effect due to other uncontrollable variables. On the other hand, we also appreciate the difficulty facing the political branch in addressing complex and intractable social problems subject to such an unlimited range of potential variables and effects.

Ultimately, it is not our task to address or reconcile the very difficult policy questions posed by the above, since

disability policies and, thus, to determine what exactly Appellee is to have purchased. The original record does not reflect whether the full policies ever were admitted into evidence, and the copies supplied with the pleadings and in the reproduced record appear to be materially incomplete. For example, significant passages were obliterated in the duplication process.

It is worth noting, however, that at least one passage of the employer's disability plan appears to contemplate some sort of contractual offset based on amounts payable under automobile insurance policies. *See* Petition to Vacate Decision of Board of Arbitrators, Exhibit B—UNUM Disability Policy (defining "other income benefits," to be offset from disability benefits payable to Appellee, to include "[t]he amount of any disability [... illegible ...] under the Pennsylvania Motor Vehicle Financial Responsibility Law."). Significantly, as well, Appellee never disputed that the disability carriers may have a contractual right of subrogation—he simply sought to avoid this as an issue in the legal proceedings against Nationwide. *See, e.g.,* N.T., May 25, 2004, at 46 (reflecting the comment of Appellee's counsel at arbitration that Appellee "may, in fact, have to pay [disability benefits] back [in a subrogation context.] That would be up to [the disability carrier] to come after him.").

The dissent's perspective concerning the equities involved in this and other cases is significantly undermined to the degree that group/program/arrangement carriers would enjoy contractual rights of coordination and/or subrogation relative to benefits under the UM/UIM policies. Moreover, to the extent that Appellee (or the dissent) would rely on Section 1720 to undermine those interests, such a position would disrupt the coordination between Sections 1720 and 1722, *see* Dissenting Opinion, at 611, 992 A.2d at 872 ("Sections 1720 and 1722 were designed to work in tandem."), further demonstrating the substantial

the Legislature has been clear in its approach. *See Program Admin. Servs., Inc. v. Dauphin County Gen. Auth.*, 593 Pa. 184, 192, 928 A.2d 1013, 1017–18 (2007) ("[I]t is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations.");[12] *Naylor v. Twp. of Hellam*, 565 Pa. 397, 408, 773 A.2d 770, 777 (2001) (recognizing the General Assembly's superior ability to examine social policy issues and determine legal standards so as to balance competing concerns).

Finally, we differ with the dissent's characterization of our decision as an "abandonment" of "well established precedent." Dissenting Opinion at 628, 992 A.2d at 881. Presumably, the dissent is referring to the Superior Court's decisions reflected in *Browne* and *Carroll*, since it otherwise acknowledges that this Court's own *Panichelli* decision simply did not concern Section 1722. *See id.* at 613–15, 992 A.2d at 873–74. As to the decisions of the intermediate appellate court, the present matter is one of first impression in this Court, and we believe the outcome should be determined according to the applicable statute as it is written. *See generally Maloney v. Valley Med. Facilities, Inc.*, 603 Pa. 399, 416–19, 984 A.2d 478, 489–90 (2009) (rejecting the notion that this Court's decisions are controlled by intermediate appellate court decisions merely because there has been delay in the presentation of a question to the Supreme Court).[13] Thus, we decidedly have not aban-

disconnect between *ad hoc* equitable assessments and the brighter-line statutory scheme.

12. We do note that some jurisdictions have found that similar efforts on the part of state legislatures violate constitutional norms. *See, e.g., Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 836 (1980), *overruled in part by Cmty. Res. for Justice, Inc. v. City of Manchester*, 154 N.H. 748, 917 A.2d 707, 721 (2007). Nevertheless, the constitutional arguments are not presented here. Furthermore, in light of the lack of advocacy and the complexity of the issues, we decline to attempt to address such questions via the presumption, in statutory interpretation, that the Legislature did not intend an unconstitutional result. *See* 1 Pa.C.S. § 1922(3).

13. The dissent also appears to favor a sort of estoppel-based approach to statutory interpretation. *See* Dissenting Opinion at 627, 992 A.2d at 881 ("This settled interpretation of the MVFRL has been reasonably relied upon during this time period by insureds when purchasing UM, UIM, and disability coverage, and by insurers in setting rates for such coverages."). However, the dissent's pronouncements concerning actual reliance by individuals and entities find no support in the record presented here. Moreover, those who have exhibited the degree of

doned well established precedent—rather, in this matter of first impression in this Court, we simply apply a clear directive from the policy-setting branch.

In summary, under Section 1722's plain terms, an insured's recovery under UM/UIM policies may be offset by group/program/arrangement benefits, including disability benefits purchased, in whole or in part, by the insured, at least so long as those benefits are not subject to subrogation.[14]

The order of the Superior Court is reversed, and jurisdiction is relinquished.

Justice McCAFFERY did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justice EAKIN join the opinion.

Justice TODD files a dissenting opinion in which Justice BAER joins.

Justice TODD, dissenting.

I respectfully, but strenuously, dissent from the majority's interpretation of 75 Pa.C.S.A. § 1722 ("Section 1722") of the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"). According to the majority opinion, an automobile insurer may reduce a disabled person's income loss benefits under his underinsured motorist policy ("UIM") by amounts he received under separate disability policies, even though he paid for such benefits entirely out of his own funds

directed interest and sophistication necessary to sift through the relevant decisions and consider the extrapolations reflected in the dissent also could readily consult: the plain text of Section 1722; the law establishing that, in matters of statutory interpretation, unambiguous statutory text controls; and the long line of cases establishing that interpretations by the intermediate appellate courts are subject to this Court's further review.

14. This area is also complicated by matters of federal preemption relative to federally regulated benefits. *See, e.g., Levine v. United Healthcare Corp.,* 402 F.3d 156, 166 (3d Cir.2005) (determining that the federal Employee Retirement Income Security Act of 1974 preempted the New Jersey Legislature's attempt to reverse the common-law collateral source doctrine relative to an ERISA-governed plan).

and through employer deductions from his wages. Such an interpretation, in my view, is contrary to our Court's previous recognition that the source of an injured individual's separately paid for income loss benefits impacts whether an automobile insurer may, under the MVFRL, reduce payments to its injured insured by the amount of such additional benefits. Further, the majority's interpretation of Section 1722 will result in automobile insurance companies receiving an unjust windfall, since it relieves them of the obligation of providing the full measure of benefits for which their insureds have paid, a result that I conclude the legislature did not intend when it enacted this statutory provision.

In 2000, Appellee Alan Tannenbaum, M.D. had a flourishing medical career. He was a board certified pediatrician with 13 years of experience who was then employed as part of a group practice by Albert Einstein Medical Center. As part of his employment arrangement, Dr. Tannenbaum was covered by a group disability policy, which was paid for by the practice.[1] Dr. Tannenbaum also had purchased two other individual disability policies which he directly paid for out of his own funds.

On December 1, 2000, Dr. Tannenbaum was the victim of a violent traffic accident in which his vehicle was struck by a truck that failed to stop at a red light. As a result of the force of the collision, Dr. Tannenbaum suffered severe bodily injuries, including fractures to his neck and spinal vertebrae, deep lacerations to his chest, abdomen and kidneys, as well as muscle and nerve damage. Dr. Tannenbaum subsequently underwent cervical spinal surgery to fuse the vertebrae in his neck. Because of the neck injury and attendant severe pain and restrictions on his range of movement, Dr. Tannenbaum could no longer perform his duties as a physician, and he was forced to retire from practice in March 2002.

1. The trial court found that the maintenance of this policy by the practice resulted in diminished income to Dr. Tannenbaum since his salary was determined by the net profit realized by the practice; hence, the practice's expense of maintaining the policy diminished his overall compensation. Trial Court Opinion, 8/14/2006, at 4.

Because of his inability to continue in his profession, Dr. Tannenbaum applied for Social Security disability benefits, as well as income loss benefits under his other disability policies. Dr. Tannenbaum was subsequently examined and determined to be disabled by his own medical experts, the Social Security Administration, and his disability insurer. As a result, he was awarded disability benefits by the Social Security Administration, and he began to receive income loss benefits under his other disability policies.

Dr. Tannenbaum brought suit against the driver responsible for causing his injuries, as well as the trucking company for which the driver worked. After a monetary settlement was reached which terminated the case, Dr. Tannenbaum sought to recover UIM income loss benefits from his own automotive policy issued by Appellant Nationwide Insurance Company ("Nationwide"). These UIM benefits represented "economic damages for lost past and future earnings, lost earning capacity and pain and suffering." *Tannenbaum v. Nationwide Ins. Co.*, 919 A.2d 267, 268 n. 1 (Pa.Super.2007). Although Nationwide's medical experts agreed Dr. Tannenbaum was permanently disabled, the parties failed to reach agreement on the amount of UIM benefits recoverable by Dr. Tannenbaum, and so the matter was submitted to arbitration.

As the majority opinion notes, Nationwide successfully precluded Dr. Tannenbaum from introducing at the arbitration proceeding the amount of benefits he received from both his group disability plan and his personal disability plans as evidence of his lost wages, thereby effectively deducting or setting off the total value of those benefits from any recovery to be awarded under his UIM policy. Thus, the arbitration panel's final award did not include the amount paid to Dr. Tannenbaum under his employer and personal disability policies.

Dr. Tannenbaum filed a petition in the Court of Common Pleas of Bucks County to set aside the arbitration award, arguing he was improperly precluded by the arbitrators from introducing into evidence the amount of benefits paid under

his group and personal disability plans as part of his wage loss calculation. He maintained Nationwide was improperly permitted to deduct the amount he was paid under the disability policies from the amount of his income loss and thereby reduce his UIM recovery.

The trial court agreed with Dr. Tannenbaum's assertions, vacated the arbitration award, and ruled that he was entitled to recover benefits under both his disability policies and his UIM coverage since he separately paid for each of the policies out of his own funds. A panel of the Superior Court affirmed in a published opinion, authored by the Honorable Judge John T.J. Kelly. *Tannenbaum v. Nationwide Ins. Co.*, 919 A.2d 267 (Pa.Super.2007). We granted Nationwide's petition for allowance of appeal to consider the question of whether Section 1722 of the MVFRL entitles an insurer in a UIM proceeding to deduct from amounts it is obligated to pay under its UIM policy the value of benefits the injured insured received from separately purchased disability policies.

The majority now reverses the Superior Court and holds that "[f]acially, Section 1722 reflects the legislature's intent to shift a substantial share of the liability for injuries caused by uninsured and underinsured motorists from automobile insurance carriers to collateral source providers ... with the aim to reduce motor vehicle insurance premiums." Majority Opinion at 603, 992 A.2d at 866. Because, in my view, the legislature's intent in enacting the MVFRL was to reduce the premiums for mandatory automobile liability insurance individuals are required to buy, I conclude that the legislature did not intend Section 1722 to preclude individuals such as Dr. Tannenbaum, who voluntarily assume the cost of both UIM and separate coverage by making payments or having their earnings reduced during their working careers, from recovering the full measure of the benefits for which they paid. I arrive at this conclusion based on the evolution of the relevant statutory provisions and caselaw concerning the recoverability of separately-paid-for excess benefits.

Prior to 1984, motorists in Pennsylvania were covered by the No Fault Act,[2] under which every registered motor vehicle owner was required to purchase a policy of insurance that paid the policyholder, in the event of an accident, basic loss benefits such as medical expenses and income loss benefits, without respect to his or her fault in causing the accident.[3] However, during the years after the No Fault Act took effect in 1974, the cost of this compulsory insurance for Pennsylvania motorists rose dramatically, along with the numbers of drivers who failed to purchase automobile insurance, so, in response, the legislature decided to repeal the No Fault Act in 1984 and replace it with the MVFRL. *See Windrim v. Nationwide Ins. Co.,* 537 Pa. 129, 136, 641 A.2d 1154, 1158 (1994) ("[T]he primary concerns of the General Assembly in repealing the No-fault Act and enacting the MVFRL were the spiraling cost of automobile insurance and the resultant increase in the number of uninsured motorists driving on public highways."); *Henrich v. Harleysville Ins. Co.,* 533 Pa. 181, 185, 620 A.2d 1122, 1124 (1993) ("The MVFRL was designed to deter people from failing to insure their vehicles more forcefully than the prior statute.").

Included in the final version of the MVFRL enacted in 1984 were Sections 1720 and 1722, which are at the heart of the present dispute, and which at that time respectively provided as follows: [4]

### § 1720. Subrogation

In actions arising out of the maintenance or use of a motor vehicle, there shall be no right of subrogation or reimbursement from a claimant's tort recovery with respect to workers' compensation benefits, benefits available under section 1711 (relating to required benefits), 1712 (relating to avail-

2. 40 P.S. § 1009.101 et seq., now repealed.

3. William C. Archbold, et al., *The Pennsylvania No–Fault Motor Vehicle Insurance Act* 1 (David Shrager ed.1979).

4. Both Sections 1720 and 1722 were originally promulgated by the Act of Feb. 11, 1984, No. 11 § 3 and then rewritten by the Act of Feb. 11, 1984, No. 12, § 3.

ability of benefits) or 1715 (relating to availability of adequate limits) or benefits in lieu thereof paid or payable.

75 Pa.C.S.A. § 1720 (1984).

### § 1722. Preclusion of pleading, proving and recovering required benefits.

In any action for damages against a tortfeasor arising out of the maintenance or use of a motor vehicle, a person who is eligible to receive benefits under the coverages set forth in section 1711(relating to required benefits) shall be precluded from pleading, introducing into evidence or recovering the amount of benefits paid or payable under section 1711. This preclusion applies only to the amount of benefits set forth in sections 1711.

75 Pa.C.S.A. § 1722 (1984). In 1984, Section 1711 required mandatory first-party coverage be provided to the insured of $10,000 in medical benefits and income loss benefits of $1,000 per month up to a maximum limit of $5,000. An insured could waive the income loss provision if the named insured had "no expectation of actual income loss due to age, disability or lack of employment history." 75 Pa.C.S.A. § 1711 (1984).

Sections 1720 and 1722 were designed to work in tandem. Under Section 1720, as originally enacted, any insurer providing benefits to its injured insured was prohibited from asserting a subrogation claim against any tort recovery the injured insured would subsequently receive. Correspondingly, under Section 1722, the injured insured was barred from recovering those same first-party benefits in any subsequent action against a tortfeasor. The net effect of the interrelationship of these two provisions was to shift the cost of the injured party's recovery from the tortfeasor's liability policy to the first-party benefit policy carried by the injured party, up to his or her first-party benefit limits, and thereby, in theory, reduce the cost of mandatory liability insurance.[5]

5. Ronca, et. al. *Pennsylvania Motor Vehicle Financial Responsibility Law* at 201 (2002) (hereinafter "Ronca"). One of the authors of this treatise, Leonard Sloane, is co-counsel for Dr. Tannenbaum.

In 1990, the legislature modified Section 1720 by adding its present language concerning payment of benefits by "any program, group contract or other arrangement for payment of benefits," so that it now reads as follows:

### § 1720.   Subrogation

In actions arising out of the maintenance or use of a motor vehicle, **there shall be no right of subrogation** or reimbursement from a claimant's tort recovery **with respect to** workers' compensation benefits, benefits available under section 1711 (relating to required benefits), 1712 (relating to availability of benefits) or 1715 (relating to availability of adequate limits) or **benefits paid or payable by a program, group contract or other arrangement whether primary or excess under section 1719** (relating to coordination of benefits).

75 Pa.C.S.A. § 1720 (emphasis added).

In 1990, the legislature also significantly rewrote Section 1722 into its present format so that this section now states: [6]

### § 1722.   Preclusion of Recovering Required Benefits

**In any action for damages against a tortfeasor or in any uninsured or underinsured motorist proceeding** arising out of the maintenance or use of a motor vehicle, **a person** who is eligible to receive benefits under the coverages set forth in this subchapter, or worker's compensation, or any program, group contract or other arrangement for the payment of benefits as defined in Section 1719 (relating to coordination of benefits) **shall be precluded from recovering the amount of benefits paid or payable under** this subchapter, or worker's compensation, or **any program, group contract, or other arrangement for payment of benefits as defined in Section 1719.**

75 Pa.C.S.A. § 1722 (emphasis added).   It is the interpretation of this current version of Section 1722 which is the focus of the present appeal.   As a result of these amendments, Section

---

**6.**  In 1989, the legislature added benefits required to be made available for purchase under Section 1715(a)(1.1) to the list of Section 1722's precluded damages.

1720 now bars payors of first-party benefits under Sections 1711, 1712, or 1715 of the MVFRL, or payors of benefits under "a program, group contract or other arrangement," from asserting any subrogation rights they possess in any tort recovery in all subsequent actions brought by the injured party. Concomitantly, since Section 1720 eliminates any right of subrogation in a tort recovery an insurer has for the benefits it paid, Section 1722 prohibits the injured individual from recovering, in a subsequent tort or UIM proceeding, any benefits in which the payor had a subrogation interest. Once more, the effect of these amendments was to shift the cost of the parties' economic losses from the mandatory liability policy of the tortfeasor, but this time to any benefit provider covering the injured party—again, ostensibly reducing the cost of the mandatory liability insurance.[7, 8]

For its definition of "program, group contract or other arrangement," Section 1722 (and Section 1720) uses that which is set forth in Section 1719 of the MVFRL, designated "Coordination of benefits," which states:

> (a) General rule.—Except for workers' compensation, a policy of insurance issued or delivered pursuant to this subchapter shall be primary. Any program, group contract or other arrangement for payment of benefits such as described in section 1711 (relating to required benefits) 1712(1) and (2) (relating to availability of benefits) or 1715 (relating to availability of adequate limits) shall be construed to contain a provision that all benefits provided therein shall be in excess of and not in duplication of any valid and collectible first party benefits provided in section 1711, 1712 or 1715 or workers' compensation.

7. The last changes to Sections 1720 and 1722 occurred in 1993 when the legislature restored the right of workers' compensation carriers to assert a subrogation claim under Section 1720, to the extent permitted by the Workers' Compensation Act, and, at the same time, altered Section 1722 to permit a recipient of workers' compensation to recover such benefits in an action against a tortfeasor, or in an UIM/UM proceeding. *See* Act of July 2, 1993, No. 44, § 25(b).

8. *See* Ronca 200–201 (effect of 1720 and 1722 was to partially abolish collateral source rule and disallow injured motorist's recovery of same damages from both tortfeasor and his own insurance).

(b) Definition.—As used in this section the term **"program, group contract or other arrangement"** includes, but is not limited to, benefits payable by a hospital plan corporation or a professional health service corporation subject to 40 Pa. C.S. Ch. 61 (relating to hospital plan corporations) or 63 (relating to professional health services plan corporations).

75 Pa.C.S.A. § 1719 (emphasis original).

To address whether Section 1722 bars recipients of benefits received under "a program, group contract or other arrangement" from recovering the UIM benefits at issue in the present case, the lower courts turned to our decision in *Panichelli v. Liberty Mut. Ins. Group,* 543 Pa. 114, 669 A.2d 930 (1996), which interpreted Section 1719's "program, group contract or other arrangement" language in the context of addressing a first-party benefits issue. It is true, as the majority has noted, that our Court was not specifically called upon in *Panichelli* to interpret Section 1722, because the precise question we considered was whether an insurer was entitled to deduct sick pay and Social Security benefits from the amount of first-party income loss benefits it was required to pay under its policy of automobile insurance covering a motorist injured in an automobile accident. Nevertheless, we explained therein why the source of benefits the injured motorist received under "a program, group contract or other arrangement"—i.e., whether the motorist paid separately for those benefits—is a paramount consideration in any determination of whether the injured individual is precluded by other provisions of the MVFRL from also receiving benefits under his or her automotive policy.

The *Panichelli* case arose when the automobile insurer refused to pay the injured motorist, Panichelli, first-party income loss benefits for the period that he received sick pay from his employer in an amount equivalent to his gross income. Once Panichelli exhausted his sick pay and began receiving Social Security benefits, the insurer commenced making income loss payments under its policy, but it deducted the amount of Social Security benefits Panichelli received from those payments. The insurer asserted its right to undertake

both actions based on its contention that the MVFRL prevented Panichelli's collection of sick benefits and Social Security benefits in addition to first-party income loss benefits, what it described as a "double recovery." *Id.* at 116, 669 A.2d at 931–32. A majority of our Court, however, rejected this "double recovery" argument. Writing for the majority, Former Chief Justice, then Justice Cappy first recounted the lower courts' reasoning that the reference in Section 1719(a) to the first-party benefits required by Section 1712(2) [9] of the MVFRL showed "an intent on the part of the legislature to allow excess recovery of wage benefits payable under any program, group contract or other arrangement." *Id.* at 117, 669 A.2d at 932. The majority noted that the trial court had concluded that the terms "any program" and "other arrangement" as used in Section 1719(a) were "extremely broad and easily encompass both sick leave benefits and social security benefits." *Id.* at 118, 669 A.2d at 932. The majority then explained why an insured's recovery of sick pay and Social Security benefits did not preclude him or her from recovering first-party income loss benefits as well, opining:

> We agree with the lower courts that, based on the language of § 1719(a), sick pay and social security benefits programs must be construed as providing benefits in excess of, and not in duplication of, the income loss benefits payable under § 1712(2).

> Panichelli's receipt of both employer provided sick leave benefits and social security disability benefits, as well as full income loss benefits, does not result in "double dipping".

9. Section 1712 provides, in relevant part:

   § 1712. Availability of benefits

   An insurer issuing or delivering liability insurance policies covering any motor vehicle of the type required to be registered under this title, except recreational vehicles not intended for highway use, motorcycles, motor-driven cycles or motorized pedalcycles or like type vehicles, registered and operated in this Commonwealth, shall make available for purchase first party benefits with respect to injury arising out of the maintenance or use of a motor vehicle as follows:
   * * *
   (2) Income loss benefit.—Includes the following:
       (i) Eighty percent of actual loss of gross income.

   75 Pa.C.S.A. § 1712.

These are benefits for which the employee has paid in the form of lower wages for the sick leave benefits and in the form of payroll deductions for the social security benefits. Thus, in receiving his sick leave pay, Panichelli was exhausting his *earned* employee benefit. Similarly, Panichelli has paid for social security disability benefits through payroll deductions, and he is now drawing on these benefits because his accident has rendered him unable to work. Liberty Mutual would have us lose sight of the fact that Panichelli has paid for his income loss benefits through premiums he paid Liberty Mutual with his own funds. He is entitled to income loss benefits under his policy in the full amount of his income loss without any offset for sick pay or social security benefits received by him.

*Panichelli,* 543 Pa. at 118, 669 A.2d at 932–33 (emphasis original).

Then–Justice, now-Chief Justice, Castille dissented, joined by Justice Flaherty. First, the dissent observed that Panichelli suffered no actual loss of gross income which triggered Liberty Mutual's duty to pay under Section 1712 for the time he was receiving sick pay since his lost income was compensated for fully by the sick pay. The dissent further suggested that, once the sick pay had ceased and Panichelli began receiving Social Security benefits, his actual loss of gross income was still reduced by the amount of the Social Security benefits he received. The dissent viewed Panichelli's additional recovery of income loss benefits under his automobile policy as resulting in his receiving a greater amount than he actually lost in actual gross income.

The majority responded to the dissent, thusly:

Because we believe that the MVFRL allows the insured to recover benefits for which he has paid or earned through his employment, as well as income loss benefits, we cannot agree with the dissent's position that Panichelli is receiving a windfall here which is contrary to the intent of the MVFRL. The dissent's position would actually serve to reward an insured who has either exhausted or is not eligible for sick leave benefits or social security disability at

the time of the accident by finding an actual loss of gross income to that person, while punishing an insured who, at the time of the accident, has accumulated sick leave or eligibility for social security disability, by finding receipt of these benefits to bear upon his eligibility for income loss benefits coverage under his insurance policy.

*Panichelli*, 543 Pa. 114, 118 n. 3, 669 A.2d 930, 933 n. 3.

Several months after *Panichelli* was decided, in the case of *Browne v. Nationwide*, 449 Pa.Super. 661, 674 A.2d 1127 (1996), the Superior Court, in addressing the scope of Section 1722, recognized *Panichelli's* concern for the importance of considering the source of separate loss benefits. Therein, the court addressed the issue of whether an insurer was entitled under Section 1722 to offset the value of Social Security benefits paid or payable to its injured policyholders against the amount of uninsured motorist ("UM") benefits it was required to pay under the terms of their policy. The policyholders, husband and wife, had a policy of auto insurance with Appellee, Nationwide, and had purchased as part of their coverage UM benefits. As the result of an automobile accident in which husband was severely injured, the policyholders lodged a claim with Nationwide for UM benefits. Because Nationwide disputed the amount it was obligated to pay under the policy, the matter went to arbitration. The arbitrators rendered an award in favor of the policyholders, and a majority of the arbitration panel refused Nationwide's request to deduct from the award the amount of Social Security benefits paid and payable to the policyholders.

Nationwide petitioned the trial court, pursuant to Section 1722, to reduce the award by $186,727.00, the value of the Social Security benefits at issue. The trial court granted the petition and reduced the benefits accordingly. In so doing, the court, relying on the Superior Court's decision in *Panichelli*, 435 Pa.Super. 290, 645 A.2d 865 (1994), opined that Social Security benefits fell within the definition of "program, group contract or other arrangement." Hence, the trial court concluded that, under Section 1722, the policyholders were

barred from recovering income loss benefits in that amount. *Browne,* 674 A.2d at 1129.

The Superior Court reversed, holding that the trial court had failed to properly consider other related sections of the MVFRL, as well as our reasoning undergirding *Panichelli. Id.* The panel majority,[10] in an opinion authored by Judge Del Sole, explained the interrelationship between Section 1722 and Section 1720 of the MVFRL. The majority pointed out that Section 1720, which relies on Section 1719's definition of "program, group contract or other arrangement," eliminates the subrogation rights for "payors of benefits similar to those benefits available under auto insurance." *Browne,* 674 A.2d at 1129. The majority elucidated that, prior to the enactment of Sections 1720 and 1722, employers and insurers such as group health care providers, which paid to an injured person benefits similar in nature to those payable under an auto insurance policy, had a right of subrogation for the amount of the benefits paid if the injured individual brought a tort action against a third-party tortfeasor. The majority observed that Section 1720 took away the subrogation right of insurers and employers for recoupment of these type of benefits, but, correspondingly, Section 1722 also precluded the injured person from recovering the amount of those benefits in his or her action against the third party tortfeasor. The majority summarized the effect of these changes as follows: "In Section 1722 the legislature has precluded recovery, where in the past subrogation resulted in a reduction of the recovery by requiring a payback by the injured party. The changes brought about in § 1720 and § 1722 have zero net effect on the injured party." *Id.*

Accordingly, the majority held:

Because Social Security disability benefits were never subject to subrogation they do not fall within the purview of Sections 1720 and 1722. Historically they have not been viewed as an item for which a traditional tort award would be reduced. Had the legislature wished to include social

10. Then–Judge, now-Justice, Saylor concurred in the result.

security disability payments within the preclusions of § 1722 it could have specifically named these payments, as was done with workers' compensation benefits. **Section 1722 was obviously designed to refer to only those benefits which are specifically recoverable as first party benefits under the MVFRL, PA.C.S.A. § 1701 *et. seq.* or which had historically been subject to subrogation. Social Security disability payments do not fit within either category.**

*Id.* (emphasis supplied).

The majority in *Browne* viewed this result as entirely consistent with our Court's reasoning in *Panichelli* since we noted therein that Social Security disability benefits were the type of benefits an employee paid for throughout his working career via payroll deductions. The majority reasoned that, because the injured policyholder in the case before it also paid for his Social Security disability benefits in the same way, through monies withheld from his paycheck, and additionally paid Nationwide a separate premium so that he could be compensated for all losses caused by uninsured motorists, his receipt of both types of benefits was not duplicative and did not constitute double dipping. *Browne,* 674 A.2d at 1129.

Two years later, in *Carroll v. Kephart,* 717 A.2d 554 (Pa.Super.1998), the Superior Court addressed the question of whether an injured individual's receipt of sick pay from her employer resulted in preclusion by Section 1722 of her recovery of lost wages from the tortfeasor. The injured person, Carroll, was a passenger in a car struck by another motorist, Kephart, and, as a result of her injuries, Carroll missed ten weeks of work. Carroll received no first-party income loss benefits, as she had not purchased them as part of her automobile insurance coverage. She did, though, receive sick pay from her employer for the period she was off work. She sued Kephart and sought to recover lost wages for her ten weeks off the job. The trial court, however, refused to allow her to collect the value of the lost wages because it concluded sick pay was a benefit within the ambit of Section 1722 and,

thus, an additional recovery of the value of her lost wages would constitute double dipping.

The Superior Court disagreed and reversed. A unanimous panel, in an opinion authored by Judge Popovich, followed the *Panichelli* and *Browne* decisions in holding that the trial court had misinterpreted Section 1722. The court reasoned that, in *Panichelli*, our Court considered sick pay to be an earned employee benefit the employee paid for through lower wages and payroll deductions. Thus, when the employee received sick pay, it constituted an exhaustion of that earned benefit by the employee. Therefore, the court reasoned, sick pay benefits could not be used to reduce an employee's recovery, as it did not constitute double dipping.

The court viewed *Panichelli's* treatment of sick pay and *Browne's* discussion of Social Security benefits as providing "definitive examples of the type of benefits that are not included in the category of benefits paid or payable under Section 1722 as to preclude recovery." *Carroll*, 717 A.2d at 558. The court interpreted both decisions as establishing the general principle that "benefits for which a plaintiff has paid for or earned through his employment are not within the purview of Section 1722 and the receipt of those benefits do not constitute a double recovery." *Id.* As a result, the court concluded that, since Carroll had separately paid for her sick pay benefits in the form of lower wages, she was not precluded by Section 1722 from also recovering the value of her wage loss from the person who caused her injury.

In the case *sub judice*, the trial court was guided by the above-referenced decisions in concluding that Dr. Tannenbaum's disability benefits did not "fall within the purview of 75 Pa.C.S.A. § 1722." Trial Court Opinion, 8/14/2006, at 3. The court found Dr. Tannenbaum had paid for and earned the benefits under his disability policies during his career.

In affirming the trial court, the Superior Court rejected Nationwide's central argument that Section 1722 treated the receipt of any benefits other than those received under an UIM policy as duplicative, and, therefore, a double recovery,

observing: "[Nationwide] confuses double recovery, which the Act does not permit, with recovery of excess benefits, for which the Act makes provision." *Tannenbaum*, 919 A.2d at 269 (footnote omitted) (citing Section 1719(a)). The court explained that its review of the relevant precedent established "a clear intent to acknowledge the legitimacy of excess benefits." *Id.* at 270. The court noted that Dr. Tannenbaum's disability policies stated that they are in excess of first-party benefits under the MVFRL, and that such excess clauses "have long been understood to provide protection to the insured in addition to other coverage which might be available to him." *Id.* (citation omitted). The court, in discussing *Panichelli*, viewed it as clearly establishing the proposition that whenever an employee has paid, in the form of lower wages or via payroll deductions, for benefits such as sick leave or Social Security, such benefits are not duplicative because the intent of the legislature, as evidenced by the interplay of Section 1719(a) and Section 1712, was to allow excess recovery of wage benefits payable under "any program, group contact, or other arrangement." *Id.*

The court also cited the *Browne* and *Carroll* decisions as supportive of the principle that Section 1722 did not bar Dr. Tannenbaum from recovering his wage loss under his UIM policy simply because he had received benefits through his separately purchased disability policies. The court explained that, in *Browne,* the insured was entitled to recover Social Security disability payments and UM benefits precisely because he had paid for the disability benefits out of his own pocket, and such benefits were therefore deemed to be in excess of the UM benefits for which he also paid, and not in duplication thereof. Likewise, the court reminded that, in *Carroll,* the insured was not precluded from recovering under her UIM policy the amount of her lost wages, even though she received sick pay since, again, she had separately paid for such sick pay coverage in the form of lower wages, and, thus, such benefits were not within the purview of Section 1722 and did not constitute double recovery.

The court further referenced the Superior Court's prior holdings in *Standish v. American Mfrs. Mut. Ins. Co.*, 698 A.2d 599 (Pa.Super.1997), and *Ricks v. Nationwide Ins. Co.*, 879 A.2d 796 (Pa.Super.2005). In *Standish*, the court determined that a workers' compensation carrier was barred from asserting a subrogation lien against UM benefits the employee received for lost wages due to an auto accident. The court concluded that the employee's UM policy was separately paid for by his own funds and was in the nature of an accident policy he maintained for his own benefit, not a liability policy covering the tortfeasor. Consequently, the court ruled the workers' compensation carrier had no right of subrogation against the worker's UM benefits.

In *Ricks*, the court relied on *Standish* to hold that an injured party receiving workers' compensation was entitled to recover the value of those benefits in an UM arbitration. In so doing, it rejected Nationwide's argument that, because the workers' compensation carrier had no right of subrogation in UM benefits under Section 1720, Section 1722 barred the worker from recovering the value of the workers' compensation benefits in addition to UM benefits.

> Summarizing these holdings, the panel below held:
>
> All of these cases involve types of personally paid insurance different than that of [Dr. Tannenbaum] herein, and [Nationwide] insists that the holdings in each are limited to the specific type of excess insurance considered. We are not persuaded, as **the overarching principle remains constant: where the personal policies resorted to are both separate from UIM, or UM, coverage, and paid for exclusively by the claimant either directly, or through payroll deductions which result in lower wages, payments received from these coverages do not duplicate benefits under the MVFRL as they are fundamentally different from these benefits.**

*Tannenbaum*, 919 A.2d at 271 (emphasis added).

Additionally, the court found its holding compelled by its view that an acceptance of Nationwide's argument would

result in an unjust windfall to insurance companies by rendering premiums paid by policyholders for excess benefits futile, since the receipt of any such benefits would never occur in these type of circumstances, as they would always be deemed "double" the payments received under their UM policy. The panel regarded this result as offensive to the statute and public policy. *Id.*

In reviewing the propriety of the lower courts' decisions in this matter, as the majority has noted, *see* 1 Pa.C.S.A. § 1921(b), statutory language which is free from all ambiguity must be given proper regard. However, there are certain other legislatively-created presumptions simultaneously applicable to aid us in ascertaining the General Assembly's intent. Specifically, we presume that the General Assembly in enacting a statute does not intend a result that is "unreasonable," 1 Pa.C.S.A. § 1922(1), intends an entire statute "to be effective and certain," 1 Pa.C.S.A. § 1922(2), and intends "to favor the public interest as against any private interest." 1 Pa.C.S.A. § 1922(5). Applying these presumptions leads me to the conclusion that the lower courts, in interpreting Section 1722, properly considered the rationale expressed in *Panichelli* regarding the relevance of the source of payment of benefits under "a program, group contract or other arrangement for the payment of benefits." Thus, I would uphold their conclusion that Section 1722 permits disabled individuals to receive the full measure of benefits under their UIM policies, in addition to disability benefits for which they paid separately for the right to receive.

As the Superior Court recognized in *Browne, Carroll,* and in its decision in the instant matter, an interpretation of Section 1722 which wholly focuses on the nature of the benefits received by an injured party under "a program, group contract or other arrangement for the payment of benefits," rather than considering the source of payment for such benefits, disregards a fundamental teaching of *Panichelli.* Nationwide presently argues that the Superior Court decision below allowing Dr. Tannenbaum to recover UIM benefits constitutes a resurrection of the collateral source rule and permits Dr.

Tannenbaum to recover his income loss twice.[11] Central to our refutation of a similar double recovery argument raised in *Panichelli* was our recognition that a core consideration in determining whether the MVFRL bars an injured individual from recovering income loss benefits under his automobile policy, as well as income loss benefits under "a program, group contract or other arrangement," is whether or not the injured person separately paid, out of his or her own pocket, for the latter coverage. We expressly recognized in *Panichelli* that, if a person pays once for income loss coverage under their automobile insurance policy, and pays yet again for additional income loss coverage under "a program, group contract or other arrangement," receipt of benefits under both policies does not result in a windfall to the injured individual. Consequently, such a circumstance does not constitute the type of impermissible double recovery which the legislature sought to avoid with the enactment of the MVFRL.

Accordingly, I conclude the lower courts properly looked to the source of Dr. Tannenbaum's disability benefits in ruling that his receipt of such benefits was not barred by Section 1722. Since Dr. Tannenbaum paid separate premiums for those disability benefits apart from the premiums he paid for UIM coverage, it is clear he is not "double dipping." Dr. Tannenbaum is not attempting to recover the same damages from his own automobile insurance carrier and from the tortfeasor who caused his injuries; thus, the collateral source rule is not implicated. Neither is this a situation such as that which was permitted under the former No Fault Act, where an injured individual was permitted to recover twice for identical expenses even though he paid but one insurance premium, such as receiving payment for medical expenses from his employer-paid group health plan and then seeking compensation for the very same medical expenses from his

11. Our Court has set forth the rule as follows: "The collateral source rule provides that payments from a collateral source shall not diminish the damages otherwise recoverable from the wrongdoer. The principle behind the collateral source rule is that it is better for the wronged plaintiff to receive a potential windfall than for a tortfeasor to be relieved of responsibility for the wrong." *Johnson v. Beane,* 541 Pa. 449, 456, 664 A.2d 96, 100 (1995) (citations omitted).

automobile carrier. *See, e.g., Allstate Ins. Co. v. Heffner,* 491 Pa. 447, 459, 421 A.2d 629, 635–36 (1980) ("[S]ection 203 of the No Fault Act concerning Collateral Benefits permits victims to recover their medical expenses from Blue Cross and Blue Shield and then recover the same expenses a second time from the no-fault carrier."). While Section 1722 is structured to now bar these types of double recovery, Dr. Tannenbaum's recovery is not of this nature.

Dr. Tannenbaum is not attempting to recover from his UIM carrier benefits he has already received from another source of coverage for which another entity paid the entire premium, such as from an employer-provided health care plan or from an automobile or liability insurance plan which covered the tortfeasor. Nor is Dr. Tannenbaum receiving a "windfall," since he specifically has paid premiums over the course of years to Nationwide for the right to receive income loss benefits under his UIM policy, and additionally has paid the cost of the premiums for the extra disability coverage he elected to purchase out of his wages. I do not construe Section 1722 as evincing the legislature's intent to prohibit recovery by individuals like Dr. Tannenbaum who procure, at their own expense, policies of excess insurance in order to augment the level of coverage they purchased under their automobile policy, because each insurance company is compensated, via premiums, for its risk under each policy.

I am, of course, mindful of the salutary purpose of the legislature in enacting the MVFRL—reducing the cost of required automobile insurance coverage to Pennsylvania consumers—as well as the equally significant objective of ensuring that the UIM provisions of that same law operate in a manner "to provide coverage to those injured by a tortfeasor who lacks adequate coverage." *Generette v. Donegal Mut. Ins. Co.,* 598 Pa. 505, 524, 957 A.2d 1180, 1192 (2008). However, I find no record support for Nationwide's bald assertion that the goal of cost containment will be undermined by allowing Dr. Tannenbaum to collect the optional UIM benefits for which he specifically paid an additional premium, or to recover the voluntary disability income loss benefits for which

he separately paid. While I recognize that insurance premiums are primarily based on risk and exposure, I do not perceive the lower court decisions in this matter, and the prior decisions of the intermediate appellate courts discussed above, as having a negative impact on the rates for mandatory liability insurance, and subverting the legislature's intent to keep those rates as low as possible. This is because these decisions do not, as explained above, resurrect the double recovery and collateral source rules with regard to recovery from tortfeasors in automobile accident litigation. Further, and importantly, as both Dr. Tannenbaum and amicus, the Pennsylvania Association of Justice, have pointed out, there is absolutely no evidence of record which suggests that Nationwide considers the existence of other insurance covering its customer when writing a policy of UIM coverage, and that it correspondingly adjusts the premiums it charges as a result of such consideration.

I therefore agree with the lower courts' conclusion that Nationwide should not be permitted under Section 1722 to deduct the amount of income loss benefits Dr. Tannenbaum received under his personal disability plans from the amount of income loss benefits he was entitled to receive under his UIM policy. This conclusion is consistent with the long standing principle of law our Court articulated in *Panichelli* that an individual is entitled to receive the full benefit of all insurance coverage for which he or she specifically paid via diminished wages. In the intervening 13 years since *Panichelli* was decided, this principle has been acknowledged and followed consistently by the intermediate appellate courts of this Commonwealth, which have uniformly concluded that an individual possessing such coverage, who also has purchased a UM or UIM policy, is not precluded by Section 1722 from recovering UM or UIM benefits if he or she is injured in an automobile accident. *See Browne, Carroll, Tannenbaum, supra.* This settled interpretation of the MVFRL has been reasonably relied upon during this time period by insureds when purchasing UM, UIM, and disability coverage, and by insurers in setting rates for such coverages.

The majority's abandonment of this well established precedent will now result in a UM or UIM carrier receiving a windfall every time it is fortunate enough to have a claimant who, by happenstance, is also covered by a separate policy of insurance for which he paid. *See, e.g., Selected Risks v. Thompson,* 520 Pa. 130, 142, 552 A.2d 1382, 1388 (1989) (endorsing general principle that, whenever coverage is paid for by the insured via a separate premium, to allow an insurance carrier to offset amounts it is obligated to pay under the policy simply because another source of benefits existed to compensate the injured party would result in a windfall to the carrier). As amicus suggests, this potentially could occur in every instance in which an injured or disabled claimant is covered by Social Security insurance, sick pay benefits, and any life insurance or personal accident indemnity plan. Under the majority's interpretation of Section 1722, such a claimant may now be precluded from collecting the full UM and UIM benefits for which he or she paid, while simultaneously allowing the UM and UIM insurer to keep the entire premium paid for such coverage. The legislature, in my view, in attempting to contain the cost of mandatory automobile liability insurance, did not also countenance the injustice of allowing a party to pay what is, in essence, a premium for illusory insurance coverage. Such a result is manifestly unreasonable, and, therefore, I cannot join the majority's interpretation of Section 1722, and must dissent.

Justice BAER joins this dissenting opinion.